UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

THOMAS ANDERSON, et al.,

      Plaintiffs,

v.

UNITED AIRLINES, INC., et al.

      Defendants

Case No. 1:23-CV-00989

Honorable Matthew F. Kennelly

**JURY TRIAL DEMANDED**

## PROPOSED FIRST AMENDED COMPLAINT

## NATURE OF THE CASE

1.     Plaintiffs are unvaccinated[1] pilots, flight attendants, ramp service workers, mechanics, technicians, customer service representatives (CSRs) and other ground staff of United Airlines, Inc. ("United") who have been fired, placed on unpaid leave, or otherwise had their careers at United limited or terminated without just compensation. Plaintiffs allege United willfully or negligently violated established federal law under U.S.C. § 360bbb-3(e)(1)(A)(ii)(III) when it mandated one hundred percent of its employees to receive an Emergency Use Authorized (EUA) investigational unapproved medical product, EUA PCR testing, and submit to EUA mask wearing. United further violated the law when it imposed consequences on those who refused to comply with the mandate for legal, religious or other

---

[1] Some plaintiffs may have been coerced into taking one or more COVID-19 unapproved experimental medical products in violation of the requirement to be informed of the "option to accept or refuse" under U.S.C. § 360bbb-3(e)(1)(A)(ii)(III). But all plaintiffs are considered unvaccinated by United, and all plaintiffs have suffered and continue to suffer the harms described in this complaint.

reasons. Plaintiffs have all submitted, or attempted to submit requests for religious accommodations that would have allowed them under the law to continue working at United without receiving coronavirus EUA unapproved experimental medical products, and all Plaintiffs have natural immunity from the disease.

2. This is an action for legal and equitable relief to redress Defendants' willful or negligent violation of established federal EUA law, invasions of privacy, negligence, failure to accommodate, religious discrimination, creation of a hostile work environment, violations of the Genetic Information Non-Disclosure Act ("GINA") and otherwise wrongful conduct that was perpetrated, encouraged, and condoned by Defendants. Such wrongful conduct was predicated on Defendants' unlawful violation of 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III), and all subsequent discrimination, harassment, and retaliation against Plaintiffs based on their requests for religious accommodations from Defendants' coronavirus vaccine mandate stems from the gross violation of established federal EUA precedent.

3. Specifically, this lawsuit is grounded in Defendants' willful, wanton, and blatant disregard of the core law on EUA's – 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III) – requirement to be informed of the "*option to accept or refuse* administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks." (Emphasis added).

4. In addition, the 2005 Federal Register established the precedent regarding the "*option to accept or refuse administration of AVA; of the consequences*, if any, of refusing administration of the product; and of the alternatives to AVA that are available, and of their benefits and risks." *See* https://www.federalregister.gov/documents/2005/02/02/05-2028/authorization-of emergency-use-of-anthrax-vaccine-absorbed-for-prevention-of-inhalation-anthrax-by#. (Emphasis added). The above reference to the anthrax vaccine's historical treatment was pleaded in Plaintiffs' Proposed Am. Comp.

filed June 21, 2023. There is a private right of action to challenge the illegal mandate of an investigational unapproved medical product. *See Doe v. Rumsfeld*, Civil Action No. 03-707 (EGS) (D.D.C. Apr. 6, 2005).

5.        Defendants' actions are devoid of logical and legal support. Today it is well acknowledged that these "vaccines" did nothing to prevent the transmission of COVID -19. Further each of President Biden's executive orders, "followed" by Defendants against Plaintiffs' interests, have been adjudged unconstitutional.

6.        The context of the EUA law and AVA precedent language originates from 21 CFR 50.25, Protection of Human Subjects and Elements of informed consent. That federal regulation explains that "*participation is voluntary*, that refusal to participate will involve *no penalty or loss of benefits* to which the subject is otherwise entitled, and that the subject may discontinue participation at any time without penalty or loss of benefits to which the subject is otherwise entitled." It also references "[t]he *consequences* of a subject's decision to withdraw from the research and procedures for orderly termination of participation by the subject" in a manner making clear   any   such   "consequences"   are   strictly medical in nature. *See* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/cfrsearch.cfm?fr=50.25.

7.        This lawsuit also seeks declaratory relief from the Defendants' experimental unapproved medical product mandate on the basis that Defendants' conduct was indistinguishable from that of a state and federal government actor and Defendants' vaccine mandate, as applied, violates privacy, equal protection and due process protections secured by both the Constitution of Illinois and the Constitution of the United States.

8.        Defendants used deception, discrimination, psychological manipulation, and physical isolation to force Plaintiffs, under threat of termination, to participate in a dangerous social and medical experiment violative of established EUA law. Defendants also violated the rule of informed consent, by coercing Plaintiffs to submit to the experimental unapproved medical product without any information on

the potential risks or benefits. Several Plaintiffs (and other United employees) have suffered adverse side-effects and harm as a result of submitting to the experimental unapproved medical product. In addition to actual physical harm, Plaintiffs now face emotional distress as they worry about possible long-term side effects. These risks may even extend to Defendants' customers if pilots who submitted to Defendants' pressure to take the EUA products suffer health effects while flying.[2]

9. Defendants have made Plaintiffs second-class citizens within the company and targeted them in a campaign of harassment designed to force plaintiffs to submit to an injection of an unknown, experimental substance of questionable efficacy. Defendants' experimental unapproved medical product mandate was illegally constituted, lacked a learned intermediary, and it engendered a hostile working environment for Plaintiffs. Defendants' actions and workplace toxicity forced Plaintiffs into an impossible decision they never needed to make; take an experimental unapproved EUA medical product or lose their livelihoods and the means by which they provide for their families.

10. In some cases, Defendants wrongfully terminated Plaintiffs who correctly requested religious accommodations. In other cases, Defendants placed Plaintiffs who correctly filed for religious exemptions on indefinite unpaid leave (termination in place) with an ever-present possibility of termination and characterized this as a "reasonable accommodation." In other cases, Defendants granted Plaintiffs religious "accommodation" and immediately proceeded to create a hostile work environment by forcing Plaintiffs to wear individually identifiable symbols distinguishing them from their peers and gave public disclosure of their private and protected health information. *It must be noted that if United had not egregiously violated EUA law, there would be no implementation of gross discrimination against*

---

[2] *See* Hoft, Jim, "Pilot dies suddenly after collapsing shortly after takeoff from Chicago airport," *Gateway Pundit.* November 22, 2022 (detailing sudden death of a vaccinated pilot for another airline while in flight; only the skill of a copilot saved the lives of dozens of passengers).

*"unvaccinated employees"* or an implementation of a hostile work environment that followed. 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III).

11.     Even after Defendants allowed some Plaintiffs to return to work, a toxic and hostile work environment, where isolation, open discrimination, and the enforced use of individually identifiable political symbols remained.

12.     A number of Plaintiffs were constructively wrongfully discharged or took early retirement to escape the hostile work environment during this period.

13.     The 21 USC 360bbb-3(e)(1)(a)(ii)(III) law is clear. The precedent in 2005 from the Federal Register for the first ever EUA applied to anthrax vaccine supports this and is also clear. The context of "consequences" from 21 CFR 50.25 supports it. No one can mandate investigational unapproved EUA medical products. This suit is brought to redress the harms Defendants have dispassionately and illegally brought upon their own employees after years of loyal service, to make them whole, and to help ensure the principles of medical freedom through informed consent are preserved forever.

## PARTIES

14.     Plaintiff Thomas Anderson is an individual and former employee of United who was constructively discharged. Anderson alleges multiple claims hereafter. But for his exercise of his religious right to claim exemption from submission to COVID-19 protocols demanded of employees by Defendants, none of Anderson's foregoing claims would have arisen.

15.     Plaintiff James Breitsprecher is an individual and former employee of United for 22 years, working as a 777 First Officer. He was twice furloughed by United. He applied for a religious exemption, but it was denied without good cause, and he was subsequently terminated for choosing not to submit to COVID-19 vaccine. He also served as a United States Navy SEAL for 9 years.

16.     Plaintiff Lora Bauer is an individual and employee of United.

17.     Plaintiff Kevin Campbell is an individual and former employee of United for 37 years, working as an aircraft technician/inspector. He was granted a religious exemption but was terminated shortly thereafter against the terms of the agreement due to Defendants' specious claim over his "non-compliance."

18.     Plaintiff David Catala is an individual and employee of United.

19.     Plaintiff James Curtis is an individual and employee of United.

20.     Plaintiff Nicholas Decker is an individual and employee of United.

21.     Plaintiff Aimee Doll is an individual and employee of United.

22.     Plaintiff Tom Floyd is an individual and former employee of United who was constructively discharged and forced to retire.

23.     Plaintiff Kevin Hendershot is an individual and employee of United.

24.     Plaintiff Kenneth Locke is an individual and employee of United.

25.     Plaintiff Brenda Mallett is an individual and employee of United.

26.     Plaintiff Brenda Marsden is an individual and employee of United.

27.     Plaintiff Sylvia Fitch-McConnell is an individual and former employee of United who was terminated.

28.     Plaintiff Michelle Miller is an individual and employee of United.

29.     Plaintiff John Morris is an individual and employee of United.

30.     Plaintiff Carole O'Kobrick is an individual and employee of United.

31.     Plaintiff Stephanie Pati is an individual and employee of United.

32.     Plaintiff Frank Quintas is an individual and former employee of United who was constructively discharged and forced to retire.

33. Plaintiff Paul Rozell is an individual and former employee of United for 27 years, working as a ramp services agent. He made multiple attempts to apply for a religious exemption, but he purportedly missed United's arbitrarily imposed deadline. He was terminated for choosing not to submit to a COVID-19 vaccine. He was on 3-week vacation during the window period in which to apply for the religious exemption, and had no knowledge of, nor access to, the application process, thus deeming it an arbitrary deadline. But he purportedly missed United's arbitrarily imposed deadline. He was terminated for choosing not to submit to a COVID-19 vaccine.

34. Plaintiff Darleen Shanley-Gilbert is an individual and employee of United.

35. Plaintiff Randy Sikora is an individual and employee of United.

36. Plaintiff Charles Snyder is an individual and employee of United.

37. Plaintiff John Sullivan is an individual and employee of United.

38. Plaintiff Doug Turner is an individual and employee of United.

39. Plaintiff Rhett Wolfe is an individual and employee of United.

40. Plaintiff James Zietlow is an individual and employee of United.

41. Plaintiff Kevin Zwierko is an individual and employee of United.

42. Defendant United Airlines, Inc. ("United") is a corporation formed under the laws of the State of Delaware with its principal place of business located in Chicago, Illinois. United is a major American airline that operates a large domestic and international route network with a fleet of roughly 834 aircraft and approximately 67,000 employees.

43. Defendant Scott Kirby is an individual and Chief Executive Officer and a Board Member of United.

44. Defendant Brett J. Hart is an individual and President of United.

45. Defendant Kate Gebo is an individual and Executive Vice President for Human

Resources and Labor Relations at United.

46.　Defendant John Slater is an individual and Senior Vice President of Inflight at United.

47.　Defendant Josh Earnst is an individual and Senior Vice President and Chief Communications Officer at United.

48.　Defendant Gregory (Greg) Hart is an individual and Executive Vice President at United.

49.　Defendant Linda JoJo is an individual and Executive Vice President and Chief Customer Officer at United.

50.　Defendant Gerald (Gerry) Laderman is an individual and Executive Vice President and Chief Financial Officer at United.

51.　Defendant Andrew Nocella is an individual and Executive Vice President and Chief Commercial Officer at United.

52.　Defendant Janet Lamkin is an individual and Senior Vice President for Market and Community Innovation at United.

53.　Defendant Jonathan M. Roitman is an individual and departed Executive Vice President and Chief Operating Officer at United.

54.　Defendant Torbjorn (Toby) J. Enqvist is an individual and Executive Vice President and Chief Operations Officer at United.

55.　Defendant Theresa (Terry) Fariello is an individual and Senior Vice President, Government Affairs and Global Public Policy at United.

56.　Defendant Sasha Johnson is an individual and Vice President of Corporate Safety at United.

57.     Defendant Bryan Quigley is an individual and Senior Vice President of Flight Operations at United.

58.     Defendant Kirk Limacher is an individual and the Vice President of Human Resources at United.

59.     Sara Nelson is an individual and International President of the Association of Flight Attendants ("AFA").

60.     Ken Diaz is an individual and serves on the AFA International Organizing and Ethical Practices Committees.

61.     Defendant Edward M. Philip is an individual and Board Member of United.

62.     Defendant Carolyn Corvi is an individual and Board Member of United.

63.     Defendant Matthew Friend is an individual and Board Member of United.

64.     Defendant Michael J. Hamilton is an individual and a departed Board Member of United.

65.     Defendant Michael Harrison is an individual and a departed acting Board Member of United.

66.     Defendant Barney Harford is an individual and Board Member of United.

67.     Defendant Michele J. Hooper is an individual and Board Member of United.

68.     Defendant Todd M. Insler is an individual and departed Board Member of United.

69.     Defendant Walter Isaacson is an individual and Board Member of United.

70.     Defendant Richard Johnsen is an individual and Board Member of United.

71.     Defendant James A.C. Kennedy is an individual and Board Member of United.

72.     Defendant Edward L. Shapiro is an individual and Board Member of United.

73.     Defendant David J. Vitale is an individual and departed Board Member of United.

74.     Defendant James M. Whitehurst is an individual and Board Member of United.

75.     Defendant Laysha Ward is an individual and Board Member of United.

## MISNOMER/ ALTER EGO

76.     In the event any parties are misnamed or are not included herein, it is Plaintiffs' contention that such was a "misidentification," "misnomer," and/or such parties are/were "alter egos" of parties named herein. Alternatively, Plaintiffs contend that any "corporate veils" should be pierced to hold such parties properly included in the interest of justice.

## JURISDICTION AND VENUE

77.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 because the case arises under the Constitution, laws, or treaties of the United States.

78.     This Court has personal jurisdiction over defendants because under *International Shoe* and its progeny, they have at least minimum contacts with Illinois such that traditional notions of fair play and substantial justice would not be offended by the exercise of jurisdiction. This Court has personal jurisdiction over Defendant United through domicile of the corporation because, pursuant to 2-209(b) of the Illinois Code of Civil Procedure, a Defendant who is either "physically present in Illinois, or who consents to defend a lawsuit in Illinois, is subject to personal jurisdiction under the common law of Illinois." Personal jurisdiction further exists under Illinois' long-arm statute as codified in section 2-209(a) of the Illinois civil code. Defendants and their agents engaged in business in the state and engaged in the commission of a tortious act within the state and other enumerated acts described in this complaint.

79.     Venue is proper in the U.S. Northern District of Illinois because United and its leadership are headquartered here and do a high percentage of their business and stage a high percentage of their flights in and around this judicial district.

## BACKGROUND

**A.     The COVID-19 Pandemic and "Vaccine" Response**

80.     The United States ("U.S.") government responded to a public health emergency of respiratory diseases caused by a novel coronavirus named "severe acute respiratory syndrome coronavirus (SARS-COV-2), commonly known as ("COVID-19"), that has been detected in over 190 countries internationally, all 50 states, the District of Columbia, and all U.S. territories.

81.     On January 30, 2020, the International Health Regulations Emergency Committee of the World Health Organization ("WHO") declared the outbreak a "Public Health Emergency of International Concern."

82.     Three (3) separate COVID-19 EUA experimental unapproved medical products have been developed and used in the U.S. The manufacturers are Moderna, Pfizer-BioNTech, and Johnson & Johnson. None of the products are vaccines in the traditional meaning of the word. Vaccines developed to eliminate diseases like polio, smallpox and the measles provide individuals with immunity from contracting the condition. These products do not provide individuals with immunity from contracting COVID-19, and they do not stop transmission of the disease. Instead, they are promoted on the grounds that they provide a "level of protection against contracting COVID-19" or that they may provide a level of protection against the "effects of COVID-19." Nevertheless, these medical products are commonly given the misnomer "vaccine."

83.     Traditional vaccines contain whole or part of a harmless bacteria or virus that is sought to provide inoculation by speeding up a process that occurs naturally. These traditional vaccines allow one's cells to 'learn' how to defend against the viral agent without suffering the consequence of a 'live' virus. In contrast, all three COVID-19 experimental unapproved medical products utilize never-before tested on humans technology which constitutes "gene therapy." Two vaccines contain messenger ribonucleic acid

("mRNA"), inserted into the cell nucleus, which serve as instructions or a recipe for the creation of a spike protein that triggers an immune response; they are synthetic surrogates of the body's genetic information. Johnson & Johnson's experimental unapproved medical product uses a different platform but retains the same type of gene therapy result.

84.     On or about September 11, 2021, the Centers for Disease Control ("CDC") dumbed down its official definition of "vaccination" from the traditional above-described definition "to prevent the disease," to now merely "the act of introducing a vaccine into the body to produce protection from a specific disease." On or around January 18, 2021, Merriam Webster diluted their definition of 'vaccine'(after Moderna created their "vaccine") by adding an alternate subparagraph "b." to their definition which describes that the Moderna product codes the body to produce spike protein which triggers an immune response.

85.     The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the medical product manufactured by Pfizer-BioNTech on December 11, 2020. One week later, the FDA issued an EUA for the Moderna COVID-19 medical product. Finally, the FDA issued an EUA for the Johnson & Johnson COVID-19 medical product on February 27, 2021.[3]

86.     An EUA is not synonymous with FDA approval. Instead, an EUA is an administrative mechanism that allows the use of an "unapproved" medical product. An EUA may be granted by the FDA to (among other reasons) facilitate medical countermeasures against the spread of infectious diseases. EUA's may be terminated or revoked by the FDA as additional information about the use of the individual

---

[3] On August 23, 2021, the FDA issued EUA for the Pfizer vaccine, Comirnaty, for individuals sixteen (16) years of age and older. On January 31, 2022, the FDA announced the EUA of Moderna's COVID19 vaccine that is marketed as Spikevax. At this time, Johnson & Johnson's COVID-19 vaccine has yet to be FDA approved for anything other than EUA.

medical product becomes better known. None of the medical products have received actual "approval" by the FDA as explained below.

87.    On or about August 23, 2021, Denise M. Hinton, Chief Scientist for the Food and Drug Administration (FDA) sent Ms. Elisa Harkins of Pfizer a Letter of Agreement (LOA) for the licensing and use of its COVID 19 mRNA injection under the title of COMIRNATY. "On August 23, 2021, FDA approved the biologics license application (BLA) submitted by BioNTech Manufacturing GmbH for COMIRNATY (COVID-19 Vaccine, mRNA) for active immunization to prevent COVID-19 caused by SARS-CoV-2 in individuals 16 years of age and older."

88.    The very next paragraph states, "On August 23, 2021, having concluded that revising this EUA is appropriate to protect the public health or safety under section 564(g)(2) of the Act, FDA is reissuing the August 12, 2021 letter of authorization in its entirety with revisions incorporated to clarify that the EUA will remain in place for the Pfizer-BioNTech COVID-19 vaccine for the *previously-authorized indication and uses*, and to authorize use of COMIRNATY (COVID-19 Vaccine, mRNA) under this EUA for certain uses that are not included in the approved BLA." (Emphasis added).

89.    Within 2 paragraphs, the FDA acknowledged that COMIRNATY was a "legally distinct" product that ultimately never entered the market. The grandiose PR stunt replaced an "approved" product that was not available with a reissued EUA for the existing experimental unapproved medical product. Multiple letters were written to Pfizer over the ensuing months to reissue authorization of the non-existing product under the EUA law. By April 18, 2023, the FDA authorized only bivalent boosters and deauthorized the original monovalent experimental unapproved medical products, which were the only available countermeasures to comply with the illegal mandates. *See* https://www.fda.gov/news-events/press-announcements/coronavirus-covid19-update-fda-authorizes-changes-simplify-use-bivalent-mrna-covid-19-vaccines. Shortly thereafter, the government halted the relevant federal mandates, while

extending the public health emergency to permit the authorization of the bivalent experimental unapproved medical products under EUA law. *See* https://www.whitehouse.gov/briefing-room/statements-

releases/2023/05/01/the-biden-administration-will-end-covid-19-vaccination-requirements-forfederal-employees-contractors-international-travelers-head-start-educators-and-cms-certifiedfacilities/

90.     This bait and switch fooled an entire nation and the world initially, but almost two years later the reality that the approved product never entered the U.S. marketplace unveils the complete and total fraud perpetrated by the government and subsequently employed as the foundation for the illegal United Airlines mandates. Presently, neither the federal mandate, nor the original experimental unapproved medical products exist. Demolishing the rationale for Defendants' vaccine mandate is Harvard Medical School biostatistician and epidemiologist Professor Martin Kulldorff, who on about August 30, 2021 observed on twitter: "Prior COVID disease (many working class) provides better immunity than vaccines (many professionals), so vaccine mandates are not only scientific nonsense, they are also discriminatory and unethical," *see* https://fee.org/articles/harvard-epidemiologist-says-the-case-for-covid-vaccine-passports-wasjust-demolished/.

**B.      Department of Justice Memo Paving the Way for Illegal Mandates**

91.     On or about July 6, 2021, Dawn Johnsen, Acting Assistant Attorney General of The Department of Justice (DOJ) issued a memo that deceptively paved the way for the mandates. (https://www.justice.gov/sites/default/files/opinions/attachments/2021/07/26/2021-07-06-mandvax.pdf). They discuss section 564 of the Federal Food Drug and Cosmetic Act (FFDCA) in which they refer to 21 USC 360bbb-3. This memo is verified by the Administration for Strategic Preparedness & Response (ASPR) under the heading of: Public Health Emergency Determinations to Support      an      Emergency Use Authorization. *See* https://aspr.hhs.gov/legal/Section564/Pages/default.aspx.

92.     The DOJ spills considerable ink in a torturous misinterpretation of the law's reference to "consequences." The memo's author invents a new term, "secondary consequences," to interpret job loss and not being allowed to attend school as somehow applying to EUA law when the law itself allows no such interpretation. None of this has ever been applied to the protection of human subjects in clinical trials or for the use of experimental unapproved medical products or EUAs. Worse yet, the DOJ notes that "FDA has the authority to impose additional conditions as the agency finds necessary or appropriate to protect the public health" – and that FDA has "the authority to adapt to changing circumstances." The misinterpretation is manufactured to justify secondary consequences.

93.     The DOJ continues to twist the 21 USC 360bbb-3(e) (1) Conditions of authorization for Unapproved products and (2) Required conditions with respect to the emergency use of an unapproved product, and ignores the language that "the Secretary shall, to the extent practicable given the applicable circumstances." (Emphasis added). By emphasizing "extent practicable" as though it allows discretion, the DOJ ignores the word "shall," which is in fact obligatory. Immediately following the law states, without caveat, the "option to accept or refuse" language. The DOJ completely omits the language "to ensure that individuals to whom the product is administered are informed of their rights" under the EUA law. (Emphasis added). Here, "ensure" is equally interpreted as obligatory.

94.     Further, the DOJ memo intentionally or incompetently omitted the language pertaining to the "consequences" of refusing the experimental unapproved medical product and its contextual basis from 21 CFR 50.25 and the DOD AVA inaugural EUA precedent where it would be considered illegal to penalize any person who refused an EUA product. See https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/cfrsearch.cfm?fr=50.25

95.     Ultimately, the idea that an experimental, unapproved product that is not FDA approved can somehow be mandated upon our youth and employees nationwide based solely on a complete

15

misinterpretation of the law by Dawn Johnsen in a DOJ opinion (rather than legal precedent, *see Doe v. Rumsfeld*, Civil Action No. 03-707 (EGS) (D.D.C. Apr. 6, 2005)) is completely illegal and unconstitutional.

### C.   Recent History of Vaccination Mandates & Accompanying Litigation

96.   Three (3) realms of employment have been the primary issue in COVID-19 litigation: (i) employees of federal contractors; (ii) private sector employees; and (iii) government employees and establishments that receive Medicare and Medicaid.

97.   First, the U.S. Court of Appeals for the Eleventh Circuit addressed the realm of litigation involving federal contractors. On January 20, 2021, President Joseph Biden ("Biden") signed Executive Order 13991 ("EO 13991"), establishing the creation of the "Safe Federal Workforce Task Force" ("Task Force"), whose stated mission is to "provide ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID-19 pandemic. On September 9, 2021, Biden signed Executive Order 14042 ("EO 14042"), to "promote[ ] economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract or contract-like instrument," which would "decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government." On December 9, 2021, a Georgia federal district court judge issued a preliminary nationwide injunction that halted enforcement of EO 14042 in the case, *Georgia v. Biden*.[4] The scope of this injunction was applicable to all federal contractors and subcontractors in all covered contracts in any state or territory of the U.S. The Eleventh Circuit Court of Appeals subsequently held that the injunction should be narrowed to specific states, to a specific industry

---

[4] *See Georgia v. Biden*, 574 F.Supp.3d 1337 (S.D. Ga. 2021).

group, and in the narrow situation of deciding whether to grant a contract to those specific members or to other contract bidders.[5] On May 9, 2023, EO 14099 revoked the requirements of EO 14042 extinguishing United's claim of federal authorization.

98.     Second, the U.S. Supreme Court tackled the issue of vaccine mandates on private sector employees on January 13, 2022, in the case, *NFIB v. OSHA*.[6] On September 9, 2021, Biden announced "a new plan to require more Americans to be vaccinated." This would be achieved by the Department of Labor issuing an emergency rule (OSHA's COVID-19 Emergency Temporary Standard (ETS)) requiring all employers with at least 100 employees to be vaccinated or show a negative test once a week.[7] The declared purpose of the mandate was to increase vaccination rates at "businesses all across America,"[8] forcing eighty-four (84) million Americans to submit to the medical products. Unvaccinated employees who did not comply with OSHA's rule would be "removed from the workplace." The rule allowed for individuals to submit religious or medical accommodation requests in accordance with the requirements of Title VII[9] of the Civil Rights Act of 1964, which prohibits employment discrimination based on race, color, religion, sex, and national origin. The U.S. Supreme Court described the rule as, "a significant encroachment into the lives – and health – of a vast number of employees" and ultimately struck down the ETS on January 13, 2022.

99.     Like EO's# 13991, 14042 and similar edicts being judicially lifted/reversed, there are multiple recent litigation precedents where agencies have been judicially blocked from enforcing COVID

---

[5] *Georgia v. President of the U.S.*, 46 F.4th 1283 (11th Cir. 2022).

[6] *Nat'l Fed'n of Indep. Bus. v. Dep't. of Lab., Occupational Safety & Health Admin.*, 142 S.Ct. 661 (2022).

[7] *Id.* at 663.

[8] *Id.* (quoting Remarks on the COVID-19 Response and National Vaccination efforts, 2021 Daily Comp. of Pres. Doc. 775, p.2).

[9] *See* Fed. Reg. 61402-551 (Nov. 5, 2021).

mandates, and reversed, due to them exceeding many constitution guardrails, not just those protecting religious freedoms.[10]

100.    Third, the U.S. Supreme Court, on January 13, 2022, simultaneously addressed the realm of healthcare service providers when the Court upheld a regulation issued by the Secretary of Health and Human Services ("HHS") that required facilities that accept Medicare and Medicaid funding to require their employees to be vaccinated.[11] However, the Court held that a facility must still recognize an individual's religious and medical accommodation/exemption requests pursuant to the rule, and must comport with the obligations prescribed by Title VII.[12] This regulation was ended effective May 11, 2023.

101.    Governments supporting these "vaccines" rely on, and widely miscite, *Jacobson v.*

---

[10] In plaintiffs' case to reinstate workers fired over COVID mandates, defeating motion to dismiss, granting full judgment for fired plaintiffs including reinstatement, full back pay, finding the NY City Health Dept. violated separation of powers doctrine, violated NY State Const. equal protection of rights, procedural due process, and that their mandates were arbitrary and capricious. *See George Garvey, et.al. v. The City of New York, et.al.* Supreme Court State of NY Index # 85163/2022 (Oct. 24, 2022). *See also* U.S. District Judge Terry A. Doughty, *State of Louisiana, et.al. v. Zavier Becerra et.al.*, Memorandum Ruling, Case no. 3:21-CV-04370 (Oct. 21, 2022), wherein 24 states sued Biden's Secretary of Health and Human Services to successfully enjoin enforcement of COVID mask and vaccine mandates in federally funded Head Start children's programs due to defendants' violation of the separation of powers doctrine, and the major questions doctrine, denying Defendants' Motion to Dismiss/or Summary Judgment, granting Plaintiffs' Motion for Summary Judgment. *See also* U.S. District Judge Kathryn Kimball Mizelle for the U.S. District Court Middle District of Florida, *Health Freedom Defense Fund v Joseph R. Biden, Jr.*, 599 F. Supp. 3d. 1144 (M.D. Fla. Apr. 18, 2022), lifting CDC COVID mandates on airlines and on all U.S. public transportation conveyances by air, land or sea comparing mandates to "detention and quarantine," stating the mandates were arbitrary, capricious, did nothing to actually prevent spread of disease, that CDC illegally skirted its agency protocol by foregoing the public comment input before enacting the rules, that CDC exceeded its authority that "Wearing a mask cleans nothing. At most it traps virus droplets. But it neither 'sanitizes' the person wearing the mask nor 'sanitizes' the conveyance."

[11] *Biden v. Missouri*, 142 S.Ct. 647 (2022).

[12] *Id.*

*Massachusetts*, 197 U.S. 11 (1905), claiming government can force vaccination. However, the government never did force smallpox vaccination on Jacobson. He merely paid a five dollar fine, so *Jacobson* is a *de minimis* precedent for Defendants.

102.    In addition, recently a roughly $10.3 million settlement was approved on December 23, 2022, to Illinois plaintiffs similarly situated to these within United Plaintiffs. It was as a class action with plaintiffs numbered *Jane Doe, 1, Jane Doe 2, etc. v. Northshore University Health System* case filed November 30, 2021, as Case No. 21-cv-05683 in the United States District Court for the Northern District of Illinois. Around 14 nurses were employed by Northshore were told they were going to be fired if they did not take the COVID-19 vaccine. *See also Curtis et al. v. PeaceHealth et al.*, Case No. 3:23-cv-05741-RJB (W.D. Wash. Aug. 31, 2023).

103.    Similarly, our Defendants' refusal to honor Plaintiffs' religious accommodations, excepting Plaintiffs from Defendants' execution of the novel coronavirus experimental unapproved medical product mandates, violates the EUA precedent making it unmistakably clear that the "consequences" stated in established EUA law are strictly medical in nature. Such a willful disregard of this magnitude and subsequent termination on discriminatory grounds would likely not withstand appellate scrutiny as the conduct flies in the face of our country's founding freedoms, including the freedom of religion and informed consent.

**D.    Conflation of Issues and Strict Interpretation of Religion Under Title VII**

104.    Plaintiffs are of the belief that recent litigation efforts to redress unlawful business practices have been to no avail because business entities, like Defendants, are able to sidestep their obligations under Title VII for two (2) primary reasons. First, Plaintiffs contend that recent litigation surrounding this developing area of the law has been the result of conflating the issues of vaccination mandates with Title VII discrimination analysis. If defendants had not violated 21 U.S. Code Sec.360bbb-3(e)(1)(A)(ii)(III),

they would not have had to violate Title VII. Second, Plaintiffs also contend that there has been too strict of an interpretation given to an individual's sincerely held religious beliefs and that Plaintiffs "sincerely held religious beliefs" are synonymous with Title VII's enumerated depiction of the word "religion."[13]

105.    In addressing the first issue, one of the purposes of this complaint is to seek applicable redress afforded to Plaintiffs pursuant to Title VII, which prohibits the unlawful employment practices undertaken by Defendants.[14] While this suit also seeks to challenge the constitutionality of the Defendants' vaccine mandate, as applied, differentiation between these claims is necessary when conducting Title VII analysis.

104.    In addressing the second issue, Plaintiffs contend that there has been too strict of an interpretation of their "sincerely held religious beliefs" and that their religious beliefs are to be considered synonymous with the Title VII's specific statement affording protections based on "religion." Under Title VII, religion is defined broadly to include all aspects of an individual's belief, observance, and practice.[15] Furthermore, this broad definition has been incorporated by the U.S. Equal Employment Opportunity Commission ("EEOC") in promulgation of regulations pertaining to religious discrimination.

---

[13] Title VII of the Civil Rights Act of 1964 provides in pertinent part:

(a)    It shall be an unlawful employment practice for an employer-

(1)    to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's…religion…; or

(2)    to limit, segregate, or classify his employees or applicants for employment in a way which would deprive or tend to deprive any individual of employment opportunities or adversely affect his status as an employee, because of such individual's…*religion*.

42 U.S.C. § 2000e-(2)(a)(1) and (2) (emphasis added).

[14] *See* 42 U.S.C. § 2000e et seq.

[15] 42 U.S.C. § 2000e(j).

105.     Plaintiffs sincerely held religious beliefs are congruent with Title VII's depiction of religion, U.S. Supreme Court precedent, applicable regulations pertaining to religion, and with EOCC guidance.

**E.     Plaintiffs Possess Sincerely Held Religious Beliefs Recognized by Law**

106.     Plaintiffs possess sincerely held religious beliefs that their body is a temple, and that their Creator planned their existence upon their creation. Plaintiffs should not be compelled to be inoculated with any experimental foreign substance or biological/medical material that violates their religious convictions and will alter the biological aspects of their human body.

107.     Plaintiffs' sincere religious beliefs are commonly shared by millions of people around the world.

108.     Plaintiffs' religious beliefs are not based upon social, political, economic, or personal philosophies.

109.     Plaintiffs' religious beliefs are founded by the teachings of a globally accepted monotheistic religion that espouses moral or theistic beliefs as to what is right and wrong and concerns ultimate ideas about an individual's life, purpose, and death.

110.     Moreover, Plaintiffs contend that it is instrumental to note that the current three (3) commercialized "vaccines" are not "vaccines" by any traditional definition; rather, these vaccines are gene-altering experimental therapies. Plaintiffs contend that the introduction of mRNA into their body, or gene therapy, which contains a body-foreign biological/medical substance that delivers metaphorical instructions that alter cell behavior, is incongruent with their deeply held religious beliefs that their body is a temple and that their Creator planned their existence and biological design before birth. Further, the introduction of gene therapy medical products causes a fundamental change in the genetic design that their Creator imparted within them. This differentiation illustrates a fundamental difference between traditional

vaccines, such as chicken pox or the measles, and the three commercialized EUA COVID-19 experimental unapproved medical products.

111.    Based on this interpretation, Plaintiffs contend there is a substantial difference between non-mRNA vaccinations and gene therapy vaccines in terms of their religious beliefs. Accordingly, Plaintiffs contend comparing these two (2) types of vaccines is a false equivalency.

112.    Plaintiffs have conducted themselves with grace in the face of Defendants' oppressive and discriminatory conduct and are entitled to the relief sought.

**GENERAL ALLEGATIONS**

113.    By mid-March 2020, even though the untreated mortality rate was below one-half of one percent, COVID-19 had been declared a pandemic. The subsequent lockdowns and measures taken by governments and large corporations wreaked havoc on the global economy and tore at the societal fabric.

114.    The three (3) "vaccines" developed as a response to the COVID-19 virus did not go through any standard form of clinical trials or normal FDA approval. Rather, they were rushed through pursuant to EUA's.

115.    A vaccine may be deemed unreasonably dangerous because of the absence of an adequate warning accompanying the product, as the product may be unavoidably unsafe without such warning. No warnings regarding these medical products were available.

116.    Nowhere in American law is there any authority to mandate EUA medicines without informed consent. "Informed" establishes that a person must be informed of known and potential benefits, known and potential risks of such use, and of the extent to which such benefits and risks are unknown. "Consent" establishes that all persons must have the option to refuse administration of the product.

Punishments or consequences for refusing medical products are strictly prohibited based on the express wording and intent of the law.[16]

117.    Further, the administration of these vaccines is performed through inter-muscular injection and implicates significant, constitutionally protected privacy interests, such as the right to be safe from battery.

118.    Plaintiffs are not unique or abhorrent. Millions of Americans refused to take these experimental medical products – *for numerous reasons, including for religious reasons.*

119.    Those who chose to not take a COVID-19 "vaccine" were prescient. These EUA experimental unapproved medical products vaccines are ineffective, dangerous and – in many cases – deadly, as shown both anecdotally and through the Vaccine Adverse Effects Reporting System ("VAERS") and Department of Defense Medical Epidemiology Database ("DOD DMED").[17] These data were referenced to the Defendants before Defendants' mandate deadline. Cases of myocarditis, pericarditis, Sudden Adult Death Syndrome (SADS), and other unexplainable deaths appear to be unique to people who did receive these COVID-19 EUA experimental unapproved medical products.

120.    COVID-19 "vaccines" are Virus-Based Gene Therapies according to the FDA's own definition.[18] These medical products are unequivocally based upon injecting genetic information into a person to change or manipulate the person's genetic information.

---

[16] *See* 21 U.S. Code Sec.360bbb-3(e)(1)(A)(ii)(III), 21 CFR 50.25.

[17] *See* https://openvaers.com/?utm_source=newsletter_31&utm_medium=email&utm_campaign=theopenvaers-red-box-report; *See also*, https://health.mil/Military-Health-Topics/Health-Readiness/AFHSD/Data-Management-and-Technical-Support/Defense-Medical-Epidemiology-Database; *See also* https://renz-law.com/dmed-data/.

[18] *See* https://www.fda.gov/vaccines-blood-biologics/cellular-gene-therapy-products/what-gene-therapy.

121.   According to the FDA: "Gene therapy products are all products that mediate their effects by transcription and/or translation of transferred genetic material and/or by integrating into the host genome and that are administered as nucleic acids, viruses, or genetically engineered microorganisms."[19]

122.   According to the CDC: "Messenger RNA, or mRNA, is genetic material that tells your body how to make proteins."[20]

123.   According to Genome.gov: "mRNA acts as a cellular messenger. DNA, which is stored in a cell's nucleus, encodes the genetic information for making proteins. mRNA transfers a copy of this genetic information outside of the nucleus, to a cells' cytoplasm, where it is translated into amino acids by ribosomes and then folded into complete proteins."[21]

124.   According to Pfizer, its vaccine contains messenger mRNA, a kind of genetic material, and a piece of the SARS-CoV-2 virus' genetic material that instructs cells in the body to make the virus' distinctive "spike" protein and trigger the immune system to learn to react defensively, producing an immune response against the virus.[22] The Johnson & Johnson medical product uses viral vector technology to instruct the cells, and causes similar gene altering effects, much like the other two (2) gene therapies.

125.   Accordingly, the three (3) COVID-19 medical products change the patient's genetic composition.[23]

---

[19] See Section I, Ftn't 1 of FDA's guidance entitled: "Design and Analysis of Shedding Studies for Virus or Bacteria-Based Gene Therapy and Oncolytic Products" dated August 2015, https://www.fda.gov/media/89036/download.

[20] See https://www.cdc.gov/coronavirus/2019-ncov/downloads/vaccines/COVID-19-mRNAinfographic_G_508.pdf.

[21] See https://www.genome.gov/genetics-glossary/messenger-rna.

[22] See https://www.pfizer.com/science/innovation/mrna-technology; See also https://www.pfizer.com/news/articles/what_makes_an_rna_vaccine_different_from_a_conventional_vaccine; See also, https://www.pfizer.com/news/articles/understanding_six_types_of_vaccine_technologies.

[23] See Zhang L., et. al., 'Reverse-transcribed SARS-CoV-2 RNA can integrate into the genome of cultured human cells and can be expressed in patient-derived tissues.' PNAS, 2021.Vol. 118, No. 21 e2105968118

126.    As such, the use of the word "vaccine" to describe these products is a misnomer and those who have been injected with a COVID-19 gene therapy experimental unapproved medical product necessarily possess different genetic material or genetic information from those who were not injected. United's employment practices further discriminate and/or provide unequal opportunities against Plaintiffs because of this genetic difference resulting from having not been injected with these medical products. That discrimination is a violation of the Genetic Information Non-Discrimination Act ("GINA").[24]

127.    These genetic alterations pose further problems to Plaintiffs, who have sincerely held religious beliefs and objections to these alterations.

128.    Some Plaintiffs are legally prohibited from taking the experimental unapproved medical products since none of them have been approved by the Federal Aviation Administration ("FAA"). Only "FAA-approved" drugs may be taken by pilots. Pilots must declare any drugs or medical procedures they have taken since their last flight physical.[25] If a pilot takes an unapproved medical product, the issuing flight surgeon must take administrative measures to revoke or deny issuance of flight physical certificate until the FAA rules on the safety of that product. Typically, it takes twelve (12) months for an FDA approved drug to be approved by the FAA.[26] The use of, or administration of a drug not approved by the

---

https://doi.org/10.1073/pnas.2105968118; *See also* Alden, M. et al., 'Intracellular Reverse Transcription of Pfizer BioNTech COVID-19 mRNA Vaccine BNT162b2 In Vitro in Human Liver Cell Line.' *Curr. Issues Mol. Biol.* 2022, Vol.44, 1115–1126, https://doi.org/10.3390/cimb44030073.

[24] *See* 42 U.S.C. § 2000ff-1, *et seq.*

[25] See, FAA's Guide for Aviation Medical Examiners https://www.faa.gov/about/office_org/headquarters_offices/avs/offices/aam/ame/guide/pharm/; *See also*, FAA's Guide for Aviation Medical Examiners- Pharmaceuticals (Therapeutic Medications) Do Not Issue - Do Not Fly, https://www.faa.gov/about/office_org/headquarters_offices/avs/offices/aam/ame/guide/pharm/dni_dnf/

[26] Note that the FAA cannot approve the COVID vaccines because they have not been officially 'approved' by the FDA.

FAA is a violation of federal aviation regulation.[27] Nonetheless, Defendants encouraged, coerced and even paid pilots to violate federal law, yet the ones who refused to break the law were the ones punished and discriminated against, as set forth below.

129.    On August 6, 2021, United CEO Scott Kirby ("Kirby") announced all employees would be required to receive a COVID-19 "vaccine" within five weeks of the FDA granting EUA of a "vaccine," or five weeks after September 20, 2021, whichever came first. United's announcement of the "vaccine" mandate policy demonstrated the policy's disingenuousness from the beginning. It purported to be concerned about "safety:"

> We know some of you will disagree with this decision to require the vaccine for all United employees. But, we have no greater responsibility to you and your colleagues than to ensure your safety when you're at work, and the facts are crystal clear: everyone is safer when everyone is vaccinated.

130.    However, Defendants' concerns about safety overwhelmingly support Plaintiffs' decisions to *not* be injected with the COVID-19 medical products.

131.    It must also be noted that Kirby and all Defendants considered themselves above the law and, under the feigned guise of safety, illegally mandated EUA products.

132.    As explained earlier, the FDA "approved" an EUA Pfizer "vaccine" on August 23, 2021. Thus, United employees were to receive at least the first dose of the "vaccine" by September 27, 2021.

---

[27] *See*, 14 C.F.R. § 61.53, which states in pertinent part, "no person who holds a medical certificate…may act as pilot in command, or in any other capacity as a required pilot flight crewmember, while that person: (1) Knows or has reason to know of any medical condition that would make the person unable to meet the requirements for the medical certificate necessary for the pilot operation; or

> (2) Is taking medication or receiving other treatment for a medical condition that results in the person being unable to meet the requirements for the medical certificate necessary for the pilot operation.

Employees were required to upload a copy of their vaccination record to a United database called Flying Together by that date. Employees who failed to do so would be terminated.

133.    If safety had been Defendants' real objective, they would have grounded all flights until it was safe to fly. In truth, Defendants' objective was to increase profit through rent-seeking activities in spite of perceived dangers.

134.    This was made obvious by Defendants' own actions, since Defendants (i) did not nor could not mandate any *passenger* flying on its aircraft or interacting with its staff to be vaccinated; (ii) did not nor could not mandate vaccination of employees from other countries, (even though many Plaintiffs worked on the same aircraft and had contact with them); (iii) did not nor could not mandate vaccination of regional airline partners that fly United customers on shorter routes that feed United's mainlines; and (iv) did not nor could not mandate vaccinations for pilots from other airlines allowed to ride in the "jump seat" of any United aircraft.

135.    To intimate compliance with Title VII, Defendants created a "Help Hub" link for accommodations – an online system to request accommodations from Defendants' "vaccine" mandate. Plaintiffs and their colleagues were given the option to request accommodation based on religious beliefs or medical reasons through United's Reasonable Accommodation Process ("RAP").

136.    Plaintiffs were *not permitted* to seek *both* religious and medical accommodation.

137.    Defendants established August 31, 2021, as the cutoff date, and required after that date, no subsequently submitted accommodation requests would be permitted.

138.    Plaintiffs were left with the choice to request accommodation, take COVID-19 medical products, or be terminated. All in complete violation of EUA law.

139.    As Plaintiffs began submitting RAP requests, Defendants followed up with probing questions seeking to determine the legitimacy of their beliefs and conditions.

27

140. For example, questions were asked such as: "Are you aware if any vaccines or medications you have previously received were created, researched, tested or otherwise involved the use of stem cells?" and if so, "please explain why receiving such vaccines or medications were not a violation of your sincerely held belief." Other questions included "What about your religious belief prevents you from getting COVID 'vaccines', but not taking other types of medicine?"; "Have you received vaccinations in the past"; and "Do you currently take, or have you taken medications of any kind (over the counter or prescription)?"

141. Defendants imposed unreasonable deadlines on responses. For example, Defendants required responses to 'vaccine'-related dictates within 3 days, often over the weekends and holidays. When Plaintiffs asked via the Help Hub whether the 3-day window meant working days or calendar days, the Hub provided no answers.

142. The Help Hub would not alert Plaintiffs when additional information was requested; in fact, Plaintiffs stopped receiving email notifications when updates were available, causing some to miss artificially imposed deadlines for failing to provide additional information.

143. Defendants acted with hostility against Plaintiffs with religious objections throughout the process. United used every possible tactic and tool to wrongfully deny accommodation requests.

144. CEO Kirby sarcastically described employees such as Plaintiffs as "all of a sudden deciding 'I'm really religious.'"

145. Defendants never provided any "accommodated" employee or Plaintiff with a date by which they could return to work and stated the period of unpaid leave could last up to 72 months (6 years). Plaintiffs were then told that any employee whose accommodation request was denied must receive the vaccine by September 27, 2021, or be terminated.

28

146.    Defendants also discriminated between customer-facing employees and noncustomer-facing employees. For those customer-facing (*i.e.*, pilots and flight attendants), the unpaid leave is to last until the risk of COVID-19 is low enough that Defendants deemed it safe or until the pandemic "meaningfully" subsides.

147.    On or about September 9, 2021, Defendants began "granting" requests for accommodations stating that for any accommodation request granted, those employees who sought same would be placed on indefinite, unpaid leave with no benefits, starting October 2, 2021. All benefits were denied to Plaintiffs. Far from being an "accommodation," this was simply a *different color* of being fired. And, in *true color*, some were terminated without an opportunity to return to work.

148.    All standard benefits were revoked and denied to Plaintiffs as a result of religious accommodation. The ability to travel in 'non-revenue' status was denied. Access to retirement savings, 401 contributions, and health savings accounts were denied. Ironically, Defendants revoked Plaintiffs health insurance and life insurance benefits during a pandemic under the pretense of ensuring health and safety. Clearly, the loss of income and the sudden burden of costly health benefits was intended to punish Plaintiffs.

149.    The "indefinite unpaid leave" deadline was pushed to November 12, 2021, due to the temporary restraining order issued by a federal court in Texas.[28]

150.    On October 25, 2021, United sent out an update to let the "accommodated" know what metrics they would use to bring people back to work. The criteria to return was based on the U.S. Community Transmission Rate, which was published daily by the CDC. For customer facing employees, "the community transmission rate must be 'moderate' or below for at least 21 consecutive days in your

---

[28] *See Sombrano vs. United Airlines,* 3:21-cv-01050-TJC-LLL.

state." For cabin crew (flight attendants and pilots) "Nationwide daily case count must be at or below 10,000 per day for 21 consecutive days on a rolling 7-day average." However, on or about March 10, 2022, Kristin Fiori, Managing Director of Corporate Safety, specifically said, "[s]ince COVID numbers have decreased significantly across the country, we have stopped reporting out on numbers and aren't doing the COVID briefings anymore."

151.     Defendants continued to punish Plaintiffs when they failed to restore Plaintiffs as described. When the reporting numbers stopped or when the COVID briefings were canceled is unknown. For non-customer facing employees (*i.e.*, mechanics, customer service agents and ramp agents), the unpaid leave is slated to last an undefined time until the "details and logistics of mitigation measures" are worked out which may include testing mandates, discriminatory mask policies, and requiring unvaccinated employees to wear identification badges; a political symbol eerily similar to those imposed on Jews during the Holocaust to induce societal condemnation, ridicule, obloquy, and *worse*.

152.     Plaintiffs were never considered for meaningful accommodations, and those exemptions granted were essentially the same as being "terminated in place" by being placed into an unpaid medical leave or unpaid leave of absence for a period of time until Defendants determined the COVID-19 pandemic was no longer a threat, or until Plaintiffs submitted to their mandate. This ambiguity forced many employees to rescind their accommodation requests out of a fear of lost income, deny their own sincerely held religious beliefs, and take an experimental gene-based therapy.

153.     United CEO Kirby's statements make clear that Defendants never intended to comply with Title VII. He said preemptively that "very few people would get through the medical and religious exemption process" and warned that Plaintiffs and their colleagues "ought to be very careful about requesting accommodations." Kirby outright threatened Plaintiffs, warning that should they seek accommodations, they are "putting their jobs on the line."

154.    In addition to Kirby's expressed threats, Defendants applied various other forms of veiled coercions, pressures and public humiliations. In early September 2021, Defendants sent postcards to Plaintiffs and their colleagues who had not yet provided proof of vaccination. The postcards were sent without the use of a privacy envelope (meaning the content of the postcards could be seen by anyone) to Plaintiffs. The postcards stated, "[o]ur records indicate that you have not uploaded your COVID-19 vaccine information to Flying Together" and then, in bold text, "[u]nvaccinated employees without a reasonable accommodation will be separated from United."

155.    Unsatisfied with attempting to control Plaintiffs' lives with vaccine mandates, Defendants also bullied, harassed and intimidated Plaintiffs including mechanics and ramp agents with an onerous mask mandate policy. It must be stated here that masks also fall under EUA law. On September 30, 2021, United implemented a new mask policy whereby "N95 or KN95 Masks are Required" for unvaccinated employees who had filed for religious accommodation. That policy not only illustrates the disparate treatment of employees with religious beliefs, but also caused division among employees – by forcing them to wear a political symbol, differentiating them from their peers – and caused targeting of religious employees with humiliation and harassment solely for punitive purposes.

156.    Plaintiffs were not even permitted to take their masks off outside so long as they were on United property, which means they could not remove their political symbols to breathe fresh air. Forcing Plaintiffs to wear N95 masks for ten-plus hour shifts caused among other things: nausea, light-headedness, brain fog and severe headaches. Since wearing political symbols does not serve any necessary business interest, it can reasonably be concluded that the purpose of Defendants policies was to mock established EUA law and promulgate tribalism, encourage discrimination, harass and publicly disparage Plaintiffs in front of their peers based on their religious beliefs.

157.    One of the effects of this policy was numerous emotional outbursts and accusatory confrontations against Plaintiffs by co-workers. Defendants successfully created and encouraged an atmosphere of "us vs. them."

158.    These actions, which were approved by Defendant officers of United, as well as the Defendant Board Members of United, caused massive harm to Plaintiffs, including lost income, emotional pain and suffering, damage to their family relationships, and more.

159.    On or about March 10, 2022, with the politics of COVID-19 and "vaccine" mandates having changed dramatically in the preceding weeks, Defendants offered Plaintiffs who were on "unpaid leave" to return to work by March 28, 2022. This followed shortly after the Southern District issued an order Jan. 13, 2022, blocking the federal vaccine mandate requiring businesses with 100 or more employees to ensure that employees are fully vaccinated.

160.    Even after Defendants allowed some Plaintiffs to return to work, a toxic, hostile work environment, where isolation, and open discrimination, remained.

161.    The communications Defendants sent to Plaintiffs made clear that they had not changed their policy of discriminating against those who have chosen to not be vaccinated for religious reasons. Specifically, Defendants made clear that their prior actions in discriminating against the religious employees and either terminating them or placing them on unpaid leave was justified, and that they could re-implement its vaccine mandate at any time and for any reason in the future. Specifically, for example, United's Vice President for Human Resources Kirk Limacher stated:

> But of all these efforts, the one that remains the most effective at protecting our employees and customers is our successful employee vaccination policy. Since November–a time that included the record-breaking Omicron surge–our vaccinated employees were remarkably safe *compared to* our employees who were on an approved request for reasonable accommodation (RAP), as well as compared to the general population…

…*Of course, if another variant emerges* or the COVID trends suddenly reverse course, we will reevaluate the appropriate safety protocols at that time…

…Finally, I hope you will *join me* in getting a booster when it's your time, consistent with CDC guidance. It's the best way to reduce the risks associated with COVID."

(Emphasis added).

162.    In the communication to mechanics, Defendants made clear that "[i]t's also important to note that if another variant emerges or the COVID-19 trends suddenly reverse course in the future, we will reevaluate our safety protocols at that time to continue to ensure we're doing everything we can to keep you and your colleagues safe."

163.    In addition, Defendants communication to flight attendants appears to indicate that if they do not return to work or provide proof of a medical condition that prevents return to work by March 28, 2022, they will be terminated:

If you are unable to return on March 28, 2022 due to your own medical condition, you must substantiate your medical condition by either faxing a completed Absence Certificate from your treating physician to United Medical at 847-700-2600, or submitting it through Help Hub, no later than March 28, 2022. Your treating physician must provide United Medical with your medical facts or restrictions to support your inability to return, treatment plan, dates of office visits, prognosis and expected return to work date. *Failure to substantiate your medical condition by the above deadline will be considered your failure to return to service and you will be separated from United Airline at that time.*

(Emphasis added).

164.    Further, Defendants continued to directly discriminate against Plaintiff pilots and flight attendants for the purported reason that certain countries:

…maintain various COVID-19 rules or restrictions that prohibit, restrict, or otherwise interfere with the Company's ability to staff flights with

> unvaccinated pilots. Therefore, while your reasonable accommodation allows you to return to work, that accommodation is subject to the responsibility to avoid bidding for flights to countries that impose such requirements. If you bid for and are awarded a schedule containing pairings to a destination that imposes restrictions based on your vaccination status, you will be removed from those trips without pay. Additionally, you are prohibited from picking-up or trading into any trips to any of these locations.

165.    However, most of the countries listed don't have COVID-19 vaccine requirements. Rather the countries only have testing requirements. These continued discriminatory policies would result, for example, in Plaintiff pilots having a 25-30% pay reduction because they would be unable to fly to those countries.

166.    This pay reduction is a result of Defendants forcing Plaintiff pilots to switch from flying higher-paying widebody airplanes (B-787, B-777, B-757/B-767) to lower paying narrowbody airplanes (B-737, A-320). United's policy against the unvaccinated Plaintiffs states:

> If your seniority prevents you from bidding around trips to Japan, South Africa or Taiwan and you are awarded one of these trips in Preferential Bidding System, you will be removed from the trip and placed on AV (standby) days. If you are placed on AV (standby) days for this reason or awarded a reserve line in a Category that operates to Japan, South Africa or Taiwan, you will be required bid to a Category (i.e. a forced airplane downgrade) that does not operate to any of those destinations on the next vacancy bid.

This was directly contrary to United's standard seniority policy and altered the terms of employment. It directly discriminated against, and punished Plaintiff pilots based on their religious beliefs who had previously put in decades of hard work in their career progression.

167.    For example, Defendants chose the countries of Japan, South Africa, and Taiwan to force these discriminatory changes and punish Plaintiff pilots even though widebody plane (B787, B-777, and B-757/767) pilots can fly to many other destinations with reasonable accommodation. Defendants refused to work with these religious pilots to allow them to continue flying these widebody planes to countries

34

with which there is no issue. Ironically, United bent over backwards to accommodate Global Elite and 1K passengers with their travel needs, regardless of their vaccine status.

168.     In addition, United stated on March 24, 2022, that vaccine cards are still required:

> At this time, the vaccine card is required. Many destinations require it for country entry, hotel check-in, public dining and use of transportation.

Yet, around the United States and the globe, vaccine cards and vaccine passports for country entry, hotel-check in, public dining and transportation were being eliminated. The use of vaccine cards— a symbol to distinguish Plaintiffs from their peers--is another discriminatory tactic utilized to harm Plaintiffs who chose not to take an experimental and harmful gene-based therapy, since they would not have a card. This policy was created and enforced to broadcast the identity of Plaintiffs for continued harassment and disparate treatment.

169.     These statements make clear that contrary to the March 28th offer to return to work, Defendants' discriminatory and illegal "vaccine" mandate policies are to continue, in effect. Plaintiffs who return to work under these conditions will be subject to the same disparate treatment and hostile work environment as before. Those who decide not to return to work because of this treatment may be terminated by Defendants, and Defendants are explicitly stating they may reimplement their "vaccine" mandate at any time. This was another method by Defendants to punish Plaintiffs, and demonstrate Defendants' newly acquired authoritarian power as a State Actor.

170.     The fake gestures of extension by Defendants in the form of offers for Plaintiffs to return to work,' combined with the hostile work environment designed to harass and disparage Plaintiffs in front of their peers constitute constructive discharge.

**UNITED'S FAILURE TO MAKE ACCOMMODATIONS AND/OR CREATION OF A**

**HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII**

171.    Defendants' actions against Plaintiffs, while violating core EUA law, have subsequently violated Title VII's prohibition against discrimination, harassment and the perpetuation of a hostile work environment.

172.    Title VII of the Civil Rights Act of 1964 prohibits Defendants from engaging in numerous forms of discrimination in virtually every employment circumstance. Specifically, Title VII provides, in relevant part:

> It shall be an unlawful employment practice for an employer…to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, <u>religion</u>, sex, or national origin…[29]

(Emphasis added). Regardless of whether the vaccination mandate was held constitutional (for healthcare workers),[30] employers are still bound to fulfill their obligations to employees pursuant to Title VII. These obligations prescribe that the employer, *inter alia*, not engage in discriminatory, harassing, or retaliatory conduct.

173.    As such, not only does Title VII of the Civil Rights Act of 1964 prohibit Defendants from engaging in numerous forms of discrimination but the statute also protects employees from being subject to other unlawful employment practices, such as the creation of a hostile work environment or harassment.

174.    Given the foregoing disparate treatment set forth in the facts herein, Defendants' conduct had a disparaging impact on Plaintiffs, which led to their termination, early retirement, placement on

---

[29] *See* 42 U.S.C. § 2000e-2.

[30] *See Biden v. Missouri*, 142 S.Ct. 647 (2022).

unpaid leave, constructive discharge or, for those Plaintiffs who were allowed to work, a hostile work environment accompanied by harassment.

175.    Defendants' conduct satisfies the elements for claims of religious discrimination due to disparate treatment, failure to provide accommodations, harassment, and the creation of a hostile work environment.

## UNITEDS' FRAUDULANT STATEMENTS AND REPRESENTATIONS

176.    Defendants have made and continue to make intentionally false statements of fact about COVID-19 and the vaccines it has mandated on its employees to deceive Plaintiffs into believing that Defendants are learned intermediaries.

177.    Defendant Kirby, speaking for United, stated that "every piece of data collected to date confirms these vaccines are safe . . ." and that "vaccines are – by far – the most effective way to protect people from COVID" and that "we know now that an unvaccinated person is about 50 times more likely to be hospitalized for COVID than a vaccinated person and nearly 300 times more likely to die." This data was never even remotely accurate.

178.    Kirby also falsely stated during a public appearance that United's unvaccinated employees were *1300 times* more likely to die than vaccinated employees. Kirby made this figure up to create fear among unvaccinated and to further coerce them into getting "jabbed". In addition, Mr. Kirby stated he calculated "*in his head*" that he could save 20 to 30 company employees by mandating full 100% vaccine compliance. He did so without providing any specific scientific analysis to his life-saving statement. (Emphasis added).

179.    Even if the above statement were true, He and all Defendants were never permitted to violate core EUA law.

180.    Defendants advanced a **false political narrative**, not a health agenda, as evidenced by the fact that Defendants did not disclose:

- There are known and potentially life-threatening risks associated with the "vaccines"

- That the employee assumes all risk associated with the "vaccine" if they take the "vaccine"

- That there are effective, proven prophylactic and curative alternative treatments for COVID other than the "vaccines"

- That long-term "vaccine" adverse effects are yet unknown

- That there is emerging evidence and data as to the "vaccine's" lack of efficacy

- Multiple mRNA injections per year will likely be required for efficacy– the safety of which is unknown

- Vaccinated individuals can still catch and spread COVID

- The fact that sick people – irrespective of their vaccination status – are the ones most likely to spread the virus

- Employees who have been injured by the "vaccine"

- That COVID is treatable and has a survival rate of over 98% for all age groups, comorbidities, races, special populations and socio-economic classes combined (generally comparable to the flu at 99% or tuberculosis at 92% or community acquired pneumonia)

- Taking the "vaccine" without FAA approval would jeopardize flight physical standards

181.    Defendants also posted an internal data update on cases that made the following false, unsupported claims: "Fully vaxxed people make up as few as 0.1% of those hospitalized with COVID;

Fully vaxxed people are less infectious than unvaccinated people, and; serious side effects from vaccine are extremely unlikely." Yet the FDA itself acknowledges numerous, possible serious adverse events that can (and do) result in permanent injuries, autoimmune diseases, chronic diseases, disabilities, and death from the COVID-19 EUA products. A private FDA presentation on October 20, 2020, reveals that the agency was fully aware of the drugs 'potentially harmful side effects before becoming available to the public, yet FDA withheld the list of side effects (which includes      death) from   public view   and gave     its     approval     anyway.     *See* https://www.christianitydaily.com/news/fda-knew-what-the-covid-vaccine-s-side-effects-werebefore-it-became-available-but-approved-it-anyway.html. Even Pfizer data from early testing showed over 148,000 adverse effects in the first 90 days of testing.[31]

182.    Defendants were aware of the foregoing conduct and false statements and participated in these wrongful acts that have caused and perpetuated massive pain, suffering, emotional distress, mental anguish, loss of job opportunities and future income.

## CONFLUENCE OF UNITED AIRLINES AND THE UNITED STATES GOVERNMENT

183.    In February of 2020, United executives and insiders, including Defendants, conveniently sold off large swaths of United stock just prior to the emergency declaration on March 13th, 2020. Defendants knew about the administration's announcement before it was made public. Defendants divested in United stock just before, United's common stock share price dropped dramatically.

---

[31] *See* 5.3.6 Cumulative Analysis of Post-Authorization Adverse Event Reports of PF-07302048 (BNT162B2) received through 28-FEB-2021 (FDA-CBER-2021-5683-0000054).



184.    Subsequent to Defendants receiving upward of $1.9 million in royalty payments, the U.S. Government increased investment and interest in United; as shown by the following Securities and Exchange Commission Report from April 30th, 2020: "purchase approximately *2.3 million* shares of UAL common stock were issued."[32] (Emphasis added).

185.    As a result of this new "agreement," the U.S. Government now owned a large share of United[33] thereby wielding substantial influence in the operation of corporate entity. In effect, United could

---

[32] *See* Form 8-K, SEC Report (April 30, 2020).; *see also* Form 424B5, *Form of prospectus disclosing information, facts, events covered in both forms*, United Airlines Holding, Inc. (June 30, 2021).

[33] Per Yahoo business, 326.93M shares. That's only about 2%, but with a net market value cap of 14B, US Govt now controls nearly half of that value in loans and stock.

no longer operate as a private entity because they were largely Government owned/indebted. Thus, United is a "person" and a "state actor" under 42 U.S.C. § 1983.[34] (Or, in the alternative, United is a "federal government actor" within the purview of *Bivens v. Six Unknown Named Agents*, 403 U.S. 38 (1971)). United was further indebted to the federal government shown in the September 28, 2020, SEC Report showing up to $7.5 billion dollars of funding.[35]

186.   On December 11, 2020, the U.S. Government began stumping for United:

> "[United] does not expect the recovery to follow a linear path, however, recent positive results in vaccine development and efficacy show an encouraging line of sight to the other side of the pandemic ".[36]

187.   This nexus between the U.S. Government was further substantiated when the Department of Defense partnered with *only* United to conduct an airplane air quality study.[37] United was further selected by the U.S. Government as the only commercial airline for transporting the COVID-19 vaccines from overseas manufacturing sites to the U.S.[38]

188.   CEO Kirby sent Biden a letter in January of 2021 stating:

---

[34] *See H.H. v. Garland*, 52 F.4th 8 (C.A.1, 2022) (noting that private party can be treated as "state actor," for purpose of determining whether private party acts under color of law, in § 1983 context, in rare circumstances falling into three categories: (1) if private party assumes traditional public function when performing the challenged conduct, (2) if private party's conduct is coerced or significantly encouraged by the state, and (3) if private party and state have become so intertwined that they were effectively joint participants in challenged conduct).

[35] *See* Form 8-K, SEC Report (Sept. 28, 2020).

[36] *See* Form 8-K, SEC Report (Dec. 11, 2020).
[37] Benitez, G. & Sweeny, S. "Risk of COVID-19 exposure on planes 'virtually non-existent' when masked, study shows," *ABC News*. October 15, 2020.

[38] Thomas, Dillon. "United Airlines lands vaccines in Denver, becoming only commercial airline to transport vaccines," *CBS Broadcasting, Inc*. (December 22, 2020).

> As you prepare to begin your term, please know that I stand ready to work with you, your administration, and Congressional leaders in support of our nation, our economy, and our environment.[39]

189.    United, now considerably controlled by the U.S. Government, started acting in lockstep with the government agenda of masking (compelled wearing of political symbols), social distancing, testing, and ultimately the Biden Administration's ambition of universal inoculation with experimental gene-based therapy products. On August 6, 2021, just prior to the Biden Administration's announcement, United revealed the collusion with the government by mandating the covid shot for 100% of its (domestic) employees.[40] Anyone who did not comply would be terminated. This was exactly what the Biden Administration advised and perpetuated.

190.    In the months leading up to the mandate in August of 2021, there were multiple instances where Kirby alluded to the close partnership United had with the federal government, and especially the Biden administration.[41] The Biden Administration could not mandate 100% EUA product inoculation but hoped to enforce a mandate through "so-called" private employers; surrogate state/federal actors like United. After the illegal United "vaccine" mandate, the lines between a privately operated airline and a

---

[39] *See* https://skift.com/wp-content/uploads/2020/11/United-Airlines-Congratulatory-Letter-.pdf.

[40] Holt, Lester. "United CEO discussed employee Covid vaccine mandate in exclusive interview," *NBC Universal.* (Aug. 9, 2021).

[41] *See* Klint, Matthew. "United Airlines 'ready to partner' with Biden Administration," *Live and Let's Fly* (Jan. 22, 2021); *see also*, Zumbach, Lauren. "Mandatory employee vaccines: United Airlines CEO makes his case to Chicago business leaders," *Chicago Tribune,* (Feb. 2, 2021); *see also* Products and Customer Experience, "United sweepstakes gives vaccinated customers a shot to win free flights, a year of travel," *United Airlines*, (May 27, 2021); *see also* Aspen Idea's interview with Scott Kirby and Walter Isaacson, https://www.aspenideas.org/sessions/flying-smart.

U.S. Government controlled state/federal actor United continued to blur as meetings and announcements from Biden and Kirby continued to flow as if commonly orchestrated.[42]

191.    Biden continually and specifically named and praised United as a beacon of what the country should be doing. Biden said, "United went from 59% of their employees to 99% of their employees (vaccinated) in two months after implementing the requirement." [43] Biden conveniently omitted the oppressive conduct described herein needed to achieve such compliance. Kirby stated, as though representing a government agency, "Customers can book with confidence on United … but if you're booking on an airline that doesn't have a vaccine requirement, they've got government rules they have to follow and *caveat emptor*."[44]

192.    The Biden administration pushed for major companies, like United, to enforce vaccine mandates though it was unclear if those efforts would survive judicial review. They did not survive.[45] Still,

---

[42] *See* Hunnicut, Trevor. "United Airlines: Biden administration examining what authority private businesses have to mandate vaccines," *Reuters*, (Aug. 6, 2021); *see also* Hunnicut, Trevor & Rucinski, Tracy. "Biden meets with United Airlines CEO, others on COVID vaccine efforts," *Reuters,* (Aug. 11, 2001); *see also* Hunnicut, Trevor & Rucinski, Tracy. "United CEO expects more companies will heed Biden's call to vaccinate," *Reuters,* (Aug. 11, 2021); *see also* Downey, Caroline. "United Airlines CEO tells Biden: vaccine mandates a 'basic safety issue'," Yahoo, (Aug. 11, 2021); *see also* Towey, Robert & Josephs, Leslie. "Covid vaccine mandates sweep across corporate America as Delta variant spurs action," *CNBC LLC.*, (Aug. 9, 2021); *see also* Smith-Schoenwalder, Cecelia. "More companies mandate COVID19 vaccines for employees, but is it enough to make a difference?" *U.S. News & World Report L.P.*, (Aug. 30, 2021); *see also* Shepardson, David, "Biden vaccine mandate will test OSHA, U.S. workforce regulator," *Reuters*, (Sept. 13, 2021); *see also* Klint, Matthew. "Why is United Airlines CEO carrying water for Biden administration?" *Live and Let's Fly*, (Sept. 20, 2021); *see also* Klint, Matthew. "United Airlines CEO meets with President Biden" *Live and Let's Fly*, (Aug. 12, 2021); *see also* Ruhl, Stephanie. "United Airlines CEO on vaccine requirements for workers: 'mandates work'," *NBC Universal*, (Oct. 6, 2021).

[43] *See* KUSI Newsroom. "Biden: United Airlines Has 99% Vaccination Rate After Firing All Unvaccinated Employees," *McKinnon Broadcasting*, (October 7, 2021).

[44] *See* Russell, Edward. "United CEO Says Beware Flying Airlines Without a Vaccine Mandate," *Skift*, (October 20, 2021).

[45] *See Nat'l Fed'n of Indep. Bus. v. Dep't. of Lab., Occupational Safety & Health Admin.*, 142 S.Ct. 661 (2022).

the White House seized on Kirby's January letter and held it up as an example of vaccine mandates working. "That's the difference. That's vaccines. That's a requirement," tweeted Ben Wakana, the Deputy Director of Strategic Communications & Engagement for the White House's Covid-19 response team.[46]

193.    Recent events not tied to the "vaccine" mandate reveal preferential treatment between government and United when United was selected to fly Afghan refugees to the U.S.,[47] and when United was selected to fly baby formula from overseas.[48] Further, of all the successful people in America specially qualified to fill the position, the Biden Administration selected Kirby by special appointment to the homeland security advisory council.[49] Also, as though a type of payment for loyalty to the administration, Kirby has been invited to the White House to attend exclusive formal dinners.[50]

194.    In the course of its actions, Defendants consistently acted in lockstep with the widely publicized goals of the Biden Administration. For purposes of these actions, whether by incentive or threat, United has become a State and/or Federal Actor.

195.    The Biden Administration delegated its authority to the private sector and sought companies like United to do its bidding. In turn, Defendants gave its employees an unconscionable ultimatum: choose between their jobs or take an experimental, life-threatening gene-based therapy, for a disease known to have a very high survivability rate and for which effective alternative treatments exist.

---

[46] *See* Schaeffer, Joe. "United Airlines CEO openly serves as Biden's co-pilot on vaccine push…on NBC's friendly airwaves," *Trib 247*, (Jan. 13, 2022).

[47] *See* Schaeffer, Joe. "Instantly-formed Rockefeller group continues to settle refugees of dubious loyalty on behalf of the USA," *Trib 247*, (Feb. 9, 2022).

[48] *See* Nerozzi, Timothy. "United Airlines to fly baby formula from London to US as part of Biden's Operation Fly Formula," *FOX News Network, LLC.,* (June 1, 2022).

[49] *See* Klint, Matthew. "United Airlines CEO appointed to Homeland Security Advisory Council," *Live and Let's Fly* (March 22, 2022).

[50] *See* Scott Kirby's LinkedIn Post: https://www.linkedin.com/posts/jscott-kirby_last-night-kathleen-andi-were-honored-to-activity-7004487004084125696-VyvF.

196. The Government has acted in concert with United to publicly support its private employer "vaccine" mandate. Defendants are engaged in a *quid pro quo* arrangement whereby United is enforcing the agenda of the government. In exchange, the Biden Administration is lining the pockets of United and the other Defendants at the expense of Plaintiffs' lives.

197. State and/or Federal Actor executives CEO Kirby and President Hart both personally gained from this Biden Administration *quid pro quo* with key Biden Administration appointments.

198. To induce compliance with its illegal "vaccine" mandate, United even colluded with unions. For instance, in the letter of agreement between United and its pilots in the service of United Airlines, Inc., as represented by The Air Line Pilots Association, International ("ALPA"), it states that United and ALPA:

> [s]eek to incentivize Pilots to become fully vaccinated against COVID. . .

The agreement continues by stating those who are fully vaccinated within the manufacturer's recommended time frame shall be provided *added pay*:

> … a new hire Pilot shall have 30 days after the Pilots' date of hire
>
> in order to complete the first (1st) dose in the vaccination process to be eligible for Add Pay in accordance with this Agreement, unless vaccination has become a requirement of the new hire Pilot's employment.
>
> …
>
> Pilots who receive a COVID booster dose necessary to maintain status as fully vaccinated shall receive one (1) hour of Add Pay for the first (1st) such booster during the effective period of this Agreement. A Pilot who utilizes sick leave to take the COVID booster (including any post-dose period mandated by the FAA) shall not be eligible to receive such Add Pay.

United is also encouraging on-going booster shots to maintain "fully vaccinated" status even though the safety of multiple injections with COVID-19 EUA products is unknown.

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION'S ("EEOC") FAILURE TO MITIGATE INJURY AND PLAINTIFFS ONGOING IRREPRABLE HARM

199.    The EEOC does not have jurisdiction over and does not supersede established EUA law.

200.    The EEOC has taken the position that they do not and will not interfere with or prevent employers from following the guidelines and suggestions made by the CDC or state/local public health authorities about steps employers should take regarding COVID-19:

> The EEOC has received many inquiries from employers and employees about the type of authorization granted by the U.S. Department of Health and Human Services ("HHS") [FDA] for the administration of three COVID-19 vaccines. These three vaccines were granted [EUA] by the FDA. It is beyond the EEOC's jurisdiction to discuss the legal implications of EUA or the FDA approach. Individuals seeking more information about the legal implications of EUA or the FDA approach can visit the FDA's EUA page.[51]

201.    The EEOC has not taken any actions much less made any public statements condemning these patently unlawful employment practices. For these reasons and others set forth below, Plaintiffs are not required to first seek recourse via the EEOC prior to bringing their discrimination and/or employment claims.

202.    Also, irreparable harm has already resulted from the delays associated with exhaustion of administrative remedies. Millions of people have been hurt and thousands have been killed due to the COVID-19 vaccines that United mandated Plaintiffs take. Not only can these experimental unapproved medical products cause injury generally, but the gene therapies pose specific harms to Plaintiffs working in the airline industry, which has requirements that employees maintain a certain standard of health for

---

[51] *See* https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-actand-other-eeo-laws#K.

safety purposes. Waiting 180 days for the EEOC process to complete or to receive a right to sue letter is not a viable option as irreparable harm is imminent not only for their jobs, but also for their safety and the safety of consumers.

203.     Additionally, the EEOC lacks the institutional capacity to resolve the types of issues presented given there are millions of employees across the United States who seek to challenge these mandated practices, and the EEOC does not have enough staff/personnel to review all the claims. Also, the EEOC does not have the authority to address the Constitutionality of all the claims associated with the employment practices at issue and does not possess the institutional knowledge or authority to redress those matters relating to health, safety and welfare. Therefore, requiring Plaintiffs to exhaust administrative remedies would be futile, useless and inadequate to redress Plaintiff's employment issues and to prevent the irreparable harm.

**CAUSES OF ACTION**

**---- COUNT I ----**

**Violation of 21 U.S. Code Sec.360bbb-3(e)(1)(A)(ii)(III), 21 CFR 50.25**

**All Plaintiffs vs. All Defendants**

204.     Plaintiffs reallege and incorporate all paragraphs above as if fully set forth herein.

205.     Plaintiffs allege United willfully or negligently violated established federal law under 21 U.S. Code Sec.360bbb-3(e)(1)(A)(ii)(III) when it mandated one hundred percent of its employees to receive Emergency Use Authorized (EUA) experimental unapproved medical products, EUA PCR testing, and EUA mask wearing. United further violated the law when it administered and enforced consequences on those who refused to comply with the mandate for religious or other reasons. All the following counts and injuries sustained by plaintiffs are a product of the total and egregious violation of this core EUA law violation.   Regardless of Defendants' objections, even though Defendant's mandates were instituted

during and in response to a pandemic emergency, as the U.S. Supreme Court noted since the beginning of the pandemic: "even in a pandemic, the Constitution cannot be put away and forgotten." Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S.Ct. 63, 208 L.Ed.2d 206 (2020).

206.    Defendants are liable to Plaintiff for punitive damages because the acts herein described constitute actual malice and oppression. Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs.

---- COUNT II ----

**Invasion of Privacy - Public Disclosure of Private Facts**

**All Plaintiffs vs. All Defendants**

207.    Plaintiffs reallege and incorporate all paragraphs above as if fully set forth herein.

208.    Defendants gave publicity to Plaintiffs protected health information ("PHI") by publishing the PHI in postcards to Plaintiffs and by forcing Plaintiffs to wear political symbols; effectively amplifying and broadcasting their PHI to other employees and consumers.

209.    The publication of Plaintiffs PHI would be highly offensive to a reasonable person and is of no legitimate public concern.

210.    As a proximate result of Defendants public disclosure of Plaintiffs PHI, Plaintiffs have suffered injury. Defendants are liable to Plaintiff for punitive damages because the acts herein described constitute actual malice and oppression. Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs.

**---- COUNT III ----**

**Negligence *Res Ipsa Loquitur***

**All Plaintiffs vs. All Defendants**

211.    Plaintiffs reallege and incorporate all paragraphs above as fully set forth herein.

212.    Defendants owe a duty of reasonable care during the course of operating their business.

213.    This duty includes protecting Plaintiffs PHI via appropriate means and procedures.

214.    Defendants breached their duty of care with their workplace-wide publishing of Plaintiffs' PHI in postcards and the forcing of Plaintiffs to wear political symbols; effectively amplifying and broadcasting their PHI to other employees and consumers.

215.    Defendants' negligence "speaks for itself" and was in violation of state and federal laws designed to protect Plaintiffs against the type of harm caused by the Defendants conduct. 216.    As    a proximate cause of Defendants negligence, Plaintiffs have suffered injury.

**---- COUNT IV ----**

**Violation of Whistleblower Act, 740 ILCS 174/ 20, *et seq.***

**Defendants' Retaliation for Refusal to Participate in a Prohibited Activity**

**Tom Anderson; James Breitsprecher; Nicholas Decker; Tom Floyd; Kevin Hendershot; James Curtis; John Morris; Frank Quintas; Rhett Wolfe; James Zietlow; Kevin Zwierko**

**vs.**

**All Defendants**

216.    Plaintiffs reallege and incorporate all paragraphs above as fully set forth herein.

217.    Defendants retaliated against Plaintiffs for their refusal to participate in a prohibited activity, and for their refusal to renounce their religious exemption claims, through termination, unpaid leave, disparate treatment, creation of a hostile work environment, discrimination and prejudice.

218.    As alleged herein, if defendants had not violated 21 U.S. Code Sec.360bbb-3(e)(1)(A)(ii)(III), they would not have had to violate Title VII.  Said violations are but a few of the regulatory violations triggering the Illinois Whistleblower Act liability alleged herein against United.

219.    Plaintiff  Breitsprrecher's application for religious exemptioni was denied with United acting with the"motive of avoiding the need for accommodating [his] religiouos practice." under Abercrombie, 575 U.S. at 773-74.  Pilot Plaintiffs refused to participate in Defendants "vaccine" mandate program in part because it violated 14 C.F.R. § 61.53.

220.    Defendants retaliated against these Plaintiffs for their refusal to participate in a prohibited activity through termination, unpaid leave, disparate treatment, creation of a hostile work environment, discrimination and prejudice. These Plaintiffs' religious practices were "a motivating factor" in Defendants' termination of them and their punishments discussed in Kluge 64, F.4th at 883.

221.    Along with the above, Plaintiff Anderson also alleges that another pivotal rule violated by United triggering liability under the Whistleblower Act herein is United's violation of Title VII U.S. Code Sec.360bbb.

222.    As a proximate cause of Defendants retaliation, Pilot Plaintiffs have suffered injury.

223.    Defendants are liable to Plaintiff for punitive damages because the acts herein described constitute actual malice and oppression. Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the

Plaintiffs.

**---- COUNT V ----**

**Violation of Title VII, 42 U.S.C. § 2000e, *et seq*.**

**Defendants' Failure to Accommodate – Religious Discrimination**

**All Plaintiffs vs. United**

224.    Plaintiffs reallege and incorporate all paragraphs above as fully set forth herein.

225.    Defendants engaged in unlawful business practices in violation of Title VII § 42 U.S.C. § 2000e, *et seq*.

226.    Defendants' actions left Plaintiffs with the impossible choice of either taking multiple of the three (3) COVID-19 vaccines, at the expense of their religious beliefs, or losing their livelihoods. In doing so, Defendants have violated Title VII of the Civil Rights Act of 1964 by taking a tangible employment action against Plaintiffs based on their sincerely held religious beliefs, failing to engage in the interactive process, and failing to provide reasonable accommodations to Plaintiffs.

227.    Plaintiffs are entitled to exercise their fundamental right to practice their religion, secured to them under the First Amendment of the Constitution of the United States.

228.    Plaintiffs are members of a protected class.

229.    Plaintiffs possess sincerely held religious beliefs that preclude them from receiving any of the experimental COVID-19 vaccines for the multitude of reasons provided for in this Complaint.

230.    Plaintiffs were qualified to perform their duties as demanded by their employment.

231.    In good-faith, Plaintiffs undertook all requisite and applicable procedures to engage in the accommodation process with Defendants; however, Defendants failed to meet its reasonable obligations.

232.    Plaintiffs made repeated and passionate attempts dictated through both informal and formal mediums to prove and educate Defendants on their sincerely held religious beliefs as well as the repeated

acts of filing formal declinations and religious accommodation requests and are qualified for religious protection that is cognizable under Title VII of the Civil Rights Act of 1964.

233.    Plaintiffs informed Defendants of their sincerely held religious beliefs and requested religious exemptions from the vaccine mandate that is applicable to them but were met with denials and disdain.

234.    Defendant refused to engage in meaningful discussions regarding Plaintiffs' beliefs, to identify any potential accommodations, or to avoid undertaking any tangible employment actions that disparately affected Plaintiffs based on their religious beliefs.

235.    During Plaintiffs' employment with Defendants and since the announcement of Defendants' COVID-19 mandate, Plaintiffs were subjected to discrimination, prejudice, hostility, harassment, and a hostile work environment because of their religious beliefs. Disparate treatment for their religious beliefs included, but was not limited to:

(i)    Disparaging and unfavorable treatment by employees, supervisors, managers, and agents of Defendants as compared to similarly situated employees who received one of the three experimental EUA products;

(ii)    Harassing statements, threats, humiliation, and constructively stripped Plaintiffs of their important responsibilities, which were extended to other employees, and undermined their ability to effectively perform their job duties at United as compared to similarly situated employees who received one of the three experimental EUA products;

(iii)    Consistent denial of Plaintiffs' religious accommodation requests;

(iv)    The arbitrary nature of granting and/or revocation of Plaintiffs' religious accommodation requests without substantive justification;

(v)     Plaintiffs were arbitrarily forced to wear political symbols, differentiating them from other employees who received one of the three experimental EUA products;

(vi)     Plaintiffs being constructively discharged and/or terminated for not receiving one of the three experimental EUA products, which are against their sincerely held religious beliefs. Anderson was clearly singled out for retribution by Defendants based on his religious exemption claim while others who submitted to one of the three "vaccines" were treated disparately-amicably by Defendants.

220.     Defendants refused to engage in a meaningful interactive process with Plaintiffs regarding their religious accommodation requests; instead, only responded to Plaintiffs with incorrect conclusions reached by irrelevant logical fallacies or misunderstanding of Plaintiffs' sincerely held religious beliefs.

221.     Defendants did not engage with Plaintiffs regarding clarification of their requested relief but instead made broad assumptions based on misattributed facts in rendering its conclusions.

222.     Defendants failed to provide Plaintiffs with any accommodations for their religious beliefs.

223.     Through Defendants actions, policies, employment practices, and conduct directed at Plaintiffs' religious faith, in addition to failing to engage in the interactive process or offer any accommodations, Defendants deprived the Plaintiffs of their constitutional right to protection under law in violation of Title VII of the Civil Rights Act of 1964. Moreover, this deprivation was done intentionally, purposefully, and willfully.

224.     Defendants are liable to Plaintiff for punitive damages because the acts herein described constitute actual malice and oppression. Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs.

225.     As a result of Defendants wrongful conduct, Plaintiffs have been and continue to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic losses.

**---- COUNT VI ----**

**Violation of Title VII, 42 U.S.C. § 2000e, *et seq*.**

**Defendant's Disparate Treatment – Religious Discrimination**

**All Plaintiffs vs. United**

226.     Plaintiffs reallege and incorporate all paragraphs above as if fully set forth herein.

227.     Defendants engaged in unlawful business practices in violation of Title VII § 42 U.S.C. § 2000e, *et seq*.

228.     Defendants' actions left Plaintiffs with the impossible choice of either taking multiple of the three (3) COVID-19 EUA products, at the expense of their religious beliefs, or losing their livelihoods. In doing so, Defendants have violated Title VII of the Civil Rights Act of 1964 by taking a tangible employment action against Plaintiffs based on their sincerely held religious beliefs, failing to engage in the interactive process, and failing to provide reasonable accommodations to Plaintiffs.

229.     Plaintiffs are entitled to exercise their fundamental right to practice their religion, secured to them under the First Amendment of the Constitution of the United States.

230.     Plaintiffs are members of a protected class.

231.     Plaintiffs possess sincerely held religious beliefs that preclude them from receiving any of the experimental COVID-19 vaccines for a multitude of reasons.

232.     Plaintiffs were qualified to perform their duties as demanded by their employment.

233.     In good-faith, Plaintiffs undertook all requisite and applicable procedures to engage in the accommodation process with Defendants; however, Defendants failed to meet its obligations.

234. Plaintiffs made repeated and passionate attempts dictated through both informal and formal mediums to prove and educate Defendants on their sincerely held religious beliefs as well as the repeated acts of filing formal declinations and religious accommodation requests and are qualified for religious protection that is cognizable under Title VII of the Civil Rights Act of 1964.

235. Plaintiffs informed Defendants of their sincerely held religious beliefs and requested religious exemptions from the vaccine mandate that is applicable to them but were met with disdain.

236. Defendant refused to engage in meaningful discussions regarding their beliefs, to identify any potential accommodations, and undertook tangible employment actions that disparately affected Plaintiffs based on their religious beliefs.

237. During Plaintiffs' employment with Defendants and since the announcement of Defendants' COVID-19 EUA product mandate, Plaintiffs were subjected to discrimination, prejudice, hostility, harassment, and a hostile work environment because of their religious beliefs. Disparate treatment for their religious beliefs included, but was not limited to:

(i) Disparaging and unfavorable treatment by employees, supervisors, managers, and agents of Defendants as compared to similarly situated employees who received one or more of the three (3) experimental EUA products;

(ii) Harassing statements, threats, humiliation, and constructively stripped Plaintiffs of their important responsibilities, which were extended to other employees, and undermined their ability to effectively perform their job duties at United as compared to similarly situated employees who received one of the three experimental EUA products;

(iii) Of Plaintiffs who were not terminated, Defendants sought to replace Plaintiffs' employment positions by individuals who did not seek religious and/or medical accommodation.

(iv)     Defendants disproportionately compensated employees who did not seek religious and/or medical accommodation.

(v)     Defendants disclosed medical documentation, medical, information, and vaccine status to customers, Defendants employees, agents, and supervisors by forcing Plaintiffs to wear identifying political symbols, differentiating them from other employees who received one of the three experimental EUA products;

(vi)     Plaintiffs being constructively discharged and/or terminated for not receiving one of the three experimental vaccines, which are against their sincerely held religious beliefs as Christians.

238.     Defendants refused to engage in a meaningful interactive process with Plaintiffs regarding their religious accommodation requests; instead, only responded to Plaintiffs with incorrect conclusions reached by irrelevant logical fallacies or misunderstanding of Plaintiffs' sincerely held religious beliefs.

239.     Defendant failed to provide Plaintiffs with any accommodations for their religious beliefs.

240.     Plaintiffs' sincerely held religious beliefs, synonymous with Title VII's meaning of the word "religion", were the motivating factor by which defendant engaged in such discriminatory conduct against Plaintiff.

241.     But-for Plaintiffs' religious beliefs, Defendant would not have engaged in such conduct that had a disparaging effect upon Plaintiffs and only individuals similarly situated to Plaintiffs.

242.     Defendants' conduct is evident that Defendants have engaged in a pattern or practice of discriminating against otherwise qualified individuals on the basis of their religion.

243.     This pattern of discrimination has a direct and disproportionate effect upon those individuals seeking religious protections based upon their sincerely held religious beliefs.

244.    Defendants' policies are only targeted at Plaintiffs and like-situated persons of religious beliefs.

245.    Through Defendants actions, policies, employment practices, and conduct directed at Plaintiffs' religious faith, in addition to failing to engage in the interactive process or offer any accommodations, Defendants deprived the Plaintiffs of their constitutional right to protection under law in violation of Title VII of the Civil Rights Act of 1964. Moreover, this deprivation was done intentionally, purposefully, and willfully.

246.    Defendants are liable to Plaintiff for punitive damages because the acts herein described constitute actual malice and oppression. Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs.

247.    As a result of Defendants wrongful conduct, Plaintiffs have been and continue to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic losses.

**---- COUNT VII ----**

**Violation of Title VII, 42 U.S.C. § 2000e, *et seq.***

**Defendants' Creation of a Hostile Work Environment**

**All Plaintiffs vs. United**

248.    Plaintiffs reallege and incorporate all paragraphs above as if fully set forth herein.

249.    Defendants engaged in unlawful business practices in violation of Title VII § 42 U.S.C. § 2000e, *et seq*.

250.    Plaintiffs suffered mistreatment based on their protected religious characteristics.

251. Defendants' conduct was so severe or pervasive that it altered the terms, conditions, or privileges of employment.

252. Plaintiffs were qualified to perform their duties as demanded by their employment.

253. In good-faith, Plaintiffs undertook all requisite and applicable procedures to inform Defendant of the harassment and toxicity that was pervasive around the workplace.

254. In an effort to achieve Defendants' political goal in conjunction with the Biden Administration, of total compliance to the 'vaccine' mandate, Defendants' actions perpetuated a work environment that an average person of ordinary sensibilities would find discriminatory through its egregious harassing conduct.

255. Plaintiffs are entitled to exercise their fundamental right to practice their religion, secured to them under the First Amendment of the Constitution of the United States.

256. Plaintiffs are members of a protected class.

257. Plaintiffs possess sincerely held religious beliefs that preclude them from receiving any of the experimental COVID-19 'vaccines' for a multitude of reasons and the Defendants repeated attempts to coerce Plaintiffs to go against their religious beliefs was unwelcomed harassment.

258. Additionally, after refusal to submit to unwelcomed and offensive actions against Plaintiffs religious beliefs, Plaintiffs were subjected to such consistent discriminatory, harassing, coercing, and intimidating conduct undertaken by the Defendants and was based on their sincerely held religious beliefs as a protected class under Title VII. Plaintiffs were subjected to discriminatory and coercive conduct including but not limited to:

(i)     Offensive or derogatory jokes in the office;

(ii)    Severe and persistent pressure to undertake a medical procedure;

(iii)   Unwelcomed comments about Plaintiffs' religious beliefs;

(iv)    Defendants' intentional dissemination of Plaintiffs' PHI and vaccination status to customers, Defendants employees, agents, and supervisors by forcing Plaintiffs to wear identifying political symbols and badges, differentiating them from other employees who received one of the three experimental EUA products;

(v)    Defendants intentional disclosure or Plaintiffs PHI and vaccination status for the whole world to see when Defendants mailed postcards containing Plaintiffs PHI and vaccination status;

(vi)    Abuse of power by Defendants, who compelled managers and supervisors to make unreasonable demands of Plaintiffs during the course of their job responsibilities;

(vii)    Psychological harassment by excluding Plaintiffs from staff gatherings, blatant rejection of Plaintiffs' input on matters, and consistent letters and memoranda threatening to terminate Plaintiffs.

(viii)    Retaliatory conduct in response to Plaintiffs' filing declination of vaccination forms and filing religious accommodation forms;

(ix)    Defendants' creation of inflexible policies that directly target Plaintiffs on the basis of their religion;

(x)    Defendants' inability to train its agents, employees, managers, or supervisors concerning Title VII of the Civil Rights Act of 1964; and/or

(xi)    Failing to participate in a meaningful manner or otherwise engage with Plaintiffs regarding their religious accommodation.

259.    Plaintiffs' subjugation to such conduct was motivated on religious grounds that were authorized, ratified, encouraged, and condoned by Defendants.

260.    Defendants' egregious conduct toward Plaintiffs was so consistent, severe, and pervasive that it altered the terms and conditions of employment and created a discriminatory and abusive working environment.

261.    Defendants are responsible for the creation of a hostile work environment under a theory of vicarious liability or direct liability.

262.    Defendants' were directly engaged in the consistent harassment and directly contributed to the creation of a hostile work environment.

263.    Accordingly, Defendants had actual knowledge of the actions of its managers and supervisors based on its involvement or conversely had constructive knowledge of such conduct based on the internal organizational policies advanced by Defendants.

264.    Over the course of their employment, Plaintiffs made numerous good-faith oral and written statements and/or complaints to their supervisors regarding Defendants' conduct toward Plaintiffs and their disparate treatment.

265.    Defendants, its supervisors, managers, and/or human resources department did not take any steps to assist in the alleviation of this harassing behavior and were in fact the primary sources of the harassment.

266.    Defendants, through its agents and employees, developed and encouraged animus against Plaintiff's because of their religious convictions.

267.    The systematic discrimination, as previously set forth, further adversely affected the Plaintiffs through Defendants' promotion and reinforcement of religious stereotypes in the workplace by equating one's religious beliefs to that of an "anti-vaxxer."

268.    Defendant failed to take any prompt and effective action reasonably calculated to result in the prevention and remedy of this religious harassment, religious discrimination, and/or creation of a hostile work environment.

269.    Defendants' egregious discriminatory conduct, given the totality of circumstances, raises to a level that an objectively reasonable person could find constitutes a hostile work environment.

270.     The actions of Defendants, as set out herein, violate Title VII.

271.     As a result of Defendants conduct, Plaintiffs have been and continue to be injured, suffering distress, humiliation, loss of prestige, mental anguish, emotional pain and suffering, and monetary and economic loss.

272.     Defendants are liable to Plaintiff for punitive damages because the acts herein described constitute actual malice and oppression. Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceeded to act with indifference to the high probability of injury to the Plaintiffs.

273.     Filing complaints or charges with the EEOC is futile, however, most Plaintiffs have done so, and the remainder are in the process of doing so.

---- COUNT VIII ----

**Violation of Title 42 U.S.C. § 2000ff-1(a)(1) and (a)(2)**

**Defendants' Discrimination Based on Genetic Information**

**All Plaintiffs vs. United**

274.     Plaintiffs reallege and incorporate all the above paragraphs as if fully set forth herein.

275.     The Genetic Information Non-Discrimination Act ("GINA") prohibits discrimination based on genetic information. Specifically, it is an unlawful employment practices for an employer to fail to refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee with respect to the compensation, terms, conditions, or privileges of employment of the employee because of genetic information.

276.    GINA also prohibits employers from limiting, segregating, or classifying the employees of the employer in any way that would deprive or tend to deprive any employee of employment opportunities or otherwise adversely affect the status of the employee because of genetic information.

277.    United is an employer within the meaning of GINA and at all times relevant hereto was engaged in an industry affecting commerce and has at all times had fifteen (15) or more employees.

278.    Plaintiffs are employees as defined by GINA.

279.    United has and continues to violate GINA by discriminating against Plaintiffs and other employees based on whether they have taken a COVID-19 gene therapy EUA experimental unapproved medical product.

280.    United unlawfully discriminated and violated GINA when they took adverse employment actions against Plaintiffs and other employees because they are not or refuse to be 'vaccinated'.

281.    United unlawfully discriminated and violated GINA when they afforded better opportunities (i.e., routes, schedules and benefits) and greater compensation to those who are 'vaccinated' than to Plaintiffs who are not, and requiring those who are unvaccinated to wear political symbols, while permitting those who are 'vaccinated' to go without wearing political symbols.

282.    Defendants engaged in these practices with malice and indifference to Plaintiffs' right to be free from discriminatory employment practices.

283.    Defendants are liable to Plaintiff for punitive damages because the acts herein described constitute actual malice and oppression. Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs.

284.    United's discrimination has harmed and will continue to harm Plaintiffs.

285. Filing complaints or charges with the EEOC is futile, however, most Plaintiffs have done so, and the remainder are in the process of doing so.

---- COUNT IX ----

**Violation of Title 42 U.S.C. § 2000ff-1(b)**

**Defendants' Acquisition of Genetic Information**

**All Plaintiffs vs. United**

286. Plaintiffs reallege and incorporate all paragraphs above as if fully set forth herein.

287. GINA makes it unlawful for an employer to request, require or purchase genetic information with respect to an employee or a family member of the employee.

288. The EUA Polymerase Chain Reaction ("PCR") tests are used to amplify small segments of DNA which is genetic material. This is the same sort of test used for forensics, cloning, genome projects for mapping genes and DNA sequencing. Genetic test means a test that analyzes DNA, RNA or chromosomes for purposes of such as the prediction of disease or vertical transmission risks, or monitoring, diagnosis or prognosis.

289. For genetic tests, the first step is extraction of genetic material from a human specimen either through blood, hair, or oral swab. This is the exact same process used in the PCR test required and requested by United to detect the genetic material of COVID-19. To violate GINA, it is not essential that the questionnaire inquire of family history. The PCR test is capable of detecting genotypes, mutations, or chromosomal changes, thus meeting the definition of a "genetic test" 42 U.S.C. sec. 2000ff(7)(A) thus implicating GINA.

290. Unauthorized PCR classification of Plaintiffs' genetic material is the crux of Defendants' GINA violation. Defendants have and continue to violate GINA when requesting and requiring the genetic information from their employees by mandating they take the EUA PCR test. Defendants violated GINA

by requesting and requiring Plaintiffs to have their genetic information collected via nasopharyngeal or nasal swab (the swab scrapes the cells from inside the nasal cavity which has the genetic material from the person for whom the specimen is collected).

291. Defendants violated GINA when they requested Plaintiffs vaccination status because they are asking for their genetic information given that the 'vaccines' are gene modification therapies.

292. Defendants limited, segregated, discriminated or classified Plaintiffs based on their genetic information and published the sensitive private health information company-wide.

293. Defendants have engaged in these practices with malice and indifference to Plaintiffs' right to be free from discriminatory employment practices.

294. Defendants are liable to Plaintiff for punitive damages because the acts herein described constitute actual malice and oppression. Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs.

295. Defendants' discrimination has harmed and will continue to harm Plaintiffs.

296. Filing complaints or charges with the EEOC is futile, however, most Plaintiffs have done so, and the remainder are in the process of doing so.

---- COUNT X ----

**Violation of Title 42 U.S.C. § 1983, *et seq*., or Alternatively, *Bivens* Claims**

**Defendants' Invasion of Right to Privacy, Denial of Equal Protection and Due Process of Law**

**All Plaintiffs vs. United**

297. Plaintiffs reallege and incorporate all paragraphs above as if fully set forth herein.

298. Plaintiffs are citizens of the United States.

299.    At all times relevant hereto, United was a government actor and a person acting under the color of law. That is, United has taken decisive employment actions that have caused Plaintiffs harm that is so impregnated with governmental character that it can be regarded as government action. The government is compelling United's actions whether through incentive or

threat.

300.    United is also acting under color of law as it has conspired with Government officials to leverage Plaintiffs' Constitutional rights against them in an effort to achieve the Biden Administration's goal of achieving universal vaccination and to acquire Plaintiffs personal, genetic information. United and the federal government have acted in incorporated lockstep and set in motion a series of acts inflicting violations of Plaintiffs' Constitutional rights.  Performing traditional federal activities through private and public meetings executive orders and unlawful coercion and duress upon employees, United has acted in concert with the federal government at the expense of their employees, including Plaintiffs.

301.    First, the right to privacy. The U.S. Supreme Court has recognized a right to personal privacy or a guarantee of certain areas or zones of privacy in the penumbra of the Bill of Rights, including the First, Fourth, Fifth and Ninth Amendments, and in the concept of liberty guaranteed by the first section of the Fourteenth Amendment. The applicable cases hold that personal rights can be deemed fundamental or implicit in the concept of ordered liberty, and included in this is the guarantee of personal privacy.

302.    Article 1, Section 6 of the Constitution of Illinois provides heightened privacy protections; greater than those provided in the Constitution of the United States

303.    Applied here, Plaintiffs fundamental right to privacy includes the reasonable expectation to be free from coercion or put under duress and subjected to battery by United to inject an unwanted,

experimental, foreign gene therapy experimental unapproved medical product injected into their body to save their livelihoods.

304.     This privacy right also includes Plaintiffs' individual freedom to choose what information they want to share or disclose that is personal in nature; and the right to control the extent to which their medical information is shared and released. As a means of coercion, United violated Plaintiffs' privacy rights when they broadcast their private information on internal memos, published postcards with PHI and forced Plaintiffs to wear political symbols.

305.     Next, equal protection. The Fourteenth Amendment, Section 1, to the United States Constitution provides:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

306.     Prior to and after the August 6, 2021, announcement of the "vaccine" mandate, "vaccinated" employees received preferential treatment compared to Plaintiffs who had not been 'vaccinated', which included increase in pay, preferential scheduling, additional benefits and privileges.

307.     United knowingly and willfully discriminated against unvaccinated Plaintiffs who expressed religious concerns and treated persons who are "vaccinated" differently without lawful justification.

308.     United, by allowing similarly situated Plaintiffs (those who are "vaccinated") to retain their jobs, be paid more, have greater privileges/schedules, and not be required to wear political symbols, engaged in a facial deprivation of equal protection.

309.     While United's "vaccine" mandate appeared neutral on its face, in practice it denies

Plaintiffs equal protection under the law.

310. Mandated "vaccinations," compelled wearing of political symbols and repeated PCR testing are substantial burdens and are employment practices that fail to offer any significant health or safety benefit; thus, there is no legitimate public interest promoted.

311. Finally, substantive due process. The Fourteenth Amendment provides heightened protection against interference with certain fundamental rights and liberty interests. The liberty interests protected by the Due Process Clause of the Fifth Amendment includes not only the privileges and rights expressly enumerated by the Constitution and Bill of Rights, but also includes those fundamental human rights implicit in structured liberty.

312. Plaintiffs have a fundamental liberty interest and right to bodily integrity and informed consent. This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment.

313. The United States Constitution guarantees that government shall not "deprive any person of life, liberty, or property without due process of law," and precludes United as a State and/or Federal Actor from infringing certain fundamental liberty interests no matter the process provided, unless the infringement serves a compelling state interest and is narrowly tailored to achieve that interest.

314. Here, United's actions are those of a State Actor and, while courts have recognized a compelling state interest in controlling the spread of infections, United lacks a compelling state interest to impose a 'vaccine' mandate because the COVID-19 EUA products themselves do not provide immunity, reduce transmissibility, and are rampant with a host of tertiary health consequences, including death. Beyond that, no private corporation or government entity may violate established EUA law.

315. EUA products strictly by law cannot satisfy the interest of preserving public health. United's mandate is not narrowly tailored since EUA experimental unapproved medical products can

never be mandated. Neither is it the least restrictive means necessary as numerous, less restrictive means than vaccination exist that serve the public interest of protecting the public's health against COVID-19. For instance, antibodies acquired through prior infection provide protection, and as stated throughout, natural immunity has been shown to provide greater protection than the COVID-19 EUA products. Service to the public interest can be accomplished through safer, less restrictive treatments and preventatives.

316.    As a direct and proximate result of United's policies, practices, regulations and conduct, Plaintiffs have suffered harm.

317.    The conduct of United as described herein represents a willful and conscious disregard for the treatment of private citizens under the law as to their right to privacy; and their actions shock the conscience of the average person and constitute an abuse of power that is malicious and purposeful.

318.    Defendants are liable to Plaintiff for punitive damages because the acts herein described constitute actual malice and oppression. Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs.

---- COUNT XI ----

**Intentional Infliction of Emotional Distress**

**All Plaintiffs vs. All Defendants**

319.    Plaintiffs reallege and incorporate the paragraphs above as if fully set forth herein.

320.    Defendants acted intentionally or recklessly with respect to the conduct set forth in this Complaint.

321.    Defendants' conduct has been and continues to be extreme and outrageous.

322.    As a proximate result of Defendants' actions, Plaintiffs have suffered severe emotional distress.

323. The harm caused by Defendants was a reasonably foreseeable consequence of the Defendants' conduct.

324. Defendants are liable to Plaintiff for punitive damages because the acts herein described constitute actual malice and oppression. Because Defendants deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiffs or, conversely, deliberately proceed to act with indifference to the high probability of injury to the Plaintiffs.

---- COUNT XII ----

**Negligent Infliction of Emotional Distress**

**All Plaintiffs vs. All Defendants**

325. Plaintiffs reallege and incorporate all paragraphs above as if fully set forth herein.

326. Defendants acted negligently and with "reckless and/or wanton disregard of the interests of Plaintiffs" with respect to the conduct set forth in this Complaint.

327. As a proximate result of Defendants' conduct, Plaintiffs have suffered serious and/or severe emotional distress.

328. The harm caused by Defendants was a reasonably foreseeable consequence of the Defendants' conduct.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

## **PRAYER FOR RELEIF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

i.      An award of compensatory damages in appropriate amounts to be established at trial, including the sum of salaries that would be earned until natural retirement along with postretirement pensions and benefits in amount no less than an average of $4,500,000 per Plaintiff;

ii.     Consequential damages or the maximum permitted by law as determined by the jury (up to $30,000,000 per Plaintiff);

iii.    Incidental damages or the maximum permitted by law as determined by the jury;

iv.     Punitive damages permitted by law as determined by the jury but in no event less than $30,000,000,000;

v.      An award of attorneys' fees and costs associated with this action;

vi.     Reinstatement and/or compensatory damages for all employees who retired early or separated in lieu of dismissal, as a result of the United's vaccine mandate;

vii.    An award of prejudgment and post-judgment interest at the legal rate to the maximum extent permitted by law; and viii. Such other and further relief as the Court may deem just and proper.

Dated: September 26, 2023      Respectfully submitted,

             **John Pierce Law P.C.**

By: */s/ John M. Pierce*
   John M. Pierce
   jpierce@johnpiercelaw.com
   21550 Oxnard St., 3rd Fl PMB 172
   Woodland Hills, CA 91367

   /s/ *Kevin F. O'Connor* .
   Kevin F. O'Connor,
   Local Counsel
   kevin@oconnor-oconnor.com
   O'Connor | O'Connor, P.C.
   110 E. Schiller St., Ste 212
   Elmhurst, IL 60126
   Tel. 630-903-6397
   Fax. 630-658-0336